UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank John SCHWEIHS,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony F. DADDINO, Defendant–
Appellant.

Nos. 90–1463, 90–1464.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1991.

Decided Aug. 6, 1992.

Mark A. Flessner, Asst. U.S. Atty. (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee U.S.

Allan A. Ackerman and Sharon G. Kramer (argued), Chicago, Ill., for defendant-appellant Frank J. Schweihs.

John L. Sullivan, Chicago (argued), for defendant-appellant Anthony F. Daddino.

Before POSNER and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The fifteen counts of the indictment of Schweihs and Daddino all involved the Hobbs Act, 18 U.S.C. § 1951. The Act punishes anyone who affects interstate commerce by extortion, or attempts or conspires so to do. COUNT ONE charged Schweihs and Daddino with conspiring with each other and other persons to affect interstate commerce by extortion of money from William R. Wemette and Leonard Cross. The conspiracy allegedly began in the summer of 1985 and continued through September 15, 1988.

COUNTS TWO, THREE, and FOUR charged Schweihs and Daddino with attempts to affect interstate commerce by extortion by obtaining money from Wemette and COUNTS FIVE through THIRTEEN charged Schweihs alone with similar attempts (except that in COUNT SIX the money was allegedly obtained from Cross). These substantive counts alleged the amounts of money and the date each was obtained (from May 1, 1987, to September 15, 1988), and the proof at trial was clear that the amounts were obtained on the dates charged. Attempt was charged on the theory that because the money paid by

Wemette and Cross was reimbursed by the FBI, Wemette may not have been hindered in purchasing supplies in interstate commerce, and commerce may thus not have been affected and the Hobbs Act offense not consummated.

COUNT FOURTEEN charged Schweihs with an attempt to affect interstate commerce by extortion by attempting to obtain money from Steven Toushin.[1] Here neither the extortion nor the affect on commerce was allegedly consummated. In any event Schweihs was acquitted on this count.

COUNT FIFTEEN charged Schweihs with soliciting Wemette and Cross to engage with Schweihs in obtaining money from Toushin by the wrongful use of actual and threatened force, violence and fear, intending that Wemette and Cross engage in conduct constituting a felony under the Hobbs Act. Solicitation under these circumstances was charged as an offense under 18 U.S.C. § 373(a).

Following a joint jury trial, the jury found Schweihs guilty on COUNTS ONE, FOUR through THIRTEEN and FIFTEEN and not guilty on COUNTS TWO, THREE and FOURTEEN. The jury found Daddino guilty on COUNTS ONE through FOUR. The district judge sentenced Daddino to 41 months imprisonment on COUNT ONE and 45 months imprisonment on COUNTS TWO and THREE to run concurrently and 5 years of probation on COUNT FOUR to run consecutively.[2] Schweihs was sentenced to 157 months imprisonment on COUNTS ONE, SIX through THIRTEEN and FIFTEEN and 180 months for COUNTS FOUR and FIVE to run concurrently.[3]

Schweihs and Daddino now appeal their convictions and their sentences.

## I. BACKGROUND

For purposes of this opinion, we construe the evidence in the light most favorable to the verdict. William Wemette was the owner of an adult video store in Chicago. He had a business assistant and friend by the name of Leonard Cross who lived with him. From about 1974 to 1988, Wemette and Cross paid "street tax" to members of the Chicago "Outfit," an organized crime group, apparently willing and able to harm anyone who would not pay. Wemette and Cross paid the "street tax" to protect themselves and their business from harm. In 1984, Wemette's business was having financial difficulties, but Amato, the current "street tax" collector, informed Wemette that if he did not pay the tax, his business would be shut down possibly by an accident or a fire. Wemette complained to other organized crime figures and was told to contact Frank Schweihs. He met with Schweihs, whom he knew had a reputation as a violent person, and Schweihs arranged for a new person, Anthony Daddino, to begin collecting the "street tax" payments. Thereafter, Daddino collected $1,100 per month from Wemette and Cross.

In 1987, Wemette contacted the FBI about the "street tax" payments. Wemette agreed to work undercover for the FBI and record his conversations with Daddino and Schweihs. After several months, Wemette, at the direction of the FBI, refused to make any further payments to Daddino until his protests about his competitor's expansion were heard by someone higher up in the "Outfit." Daddino advised him against withholding the payments and warned him that he might not like the next guy that came to collect. Schweihs then began to collect the monthly payments from Wemette and Cross. When Schweihs came to their apartment to collect the tax, he often discussed the possibility of expanding or moving Wemette's business and making himself a partner in that business. On numerous occasions, Schweihs mentioned his connections with

---

1. The parties do not use a consistent spelling for Toushin, using both Touchin and Toushin. We have chosen to spell it Toushin.

2. COUNTS TWO through FOUR were pre-guidelines; therefore, only the sentence on COUNT ONE was governed by the Sentencing Guidelines.

3. COUNTS FOUR and FIVE were pre-guidelines.

the "Outfit." They also discussed the competition from Steven Toushin's nearby video business, and Schweihs asked Wemette and Cross for information about Toushin and his business. Video recordings and transcripts of most of these conversations were introduced at the trial.

## II. DEFENDANT SCHWEIHS

### A. Evidence Of Prior Bad Acts

The taped conversations took place on some twenty occasions from May 1, 1987, to September 15, 1988. Primarily they were between Daddino and Wemette, or Schweihs and Wemette, with occasional participation by Cross. During a number of these conversations a payment of "street tax" was made. The conversations did not contain express threats that Wemette or Cross or their business would be harmed if the payments were not continued. Schweihs in particular often spoke about mutual friends and events during the period he and Wemette had known each other. He offered favors and advice concerning the operation of Wemette's business and listened to his complaints. A jury could have interpreted the conversations as friendly in tone.

On the other hand, the making of the same or similar payments of "street tax" over many years, without receiving legitimate goods or services in return, is itself the basis of a reasonable inference that the payments were induced by fear of harm. The conversations clearly indicated that Daddino and Schweihs were acting for others in an organized way. Schweihs made reference to several instances of violence and death, subject, in context, to the interpretation that Schweihs was associated with those events, if not a perpetrator of them. References to an "accident" happening to someone or something were a euphemism for violent harm befalling that person or property.

The critical issues for the jury were whether the payments by Wemette and Cross had been induced by wrongful use of threatened force or fear, including fear of harm to business or property, and whether the defendants were innocent collectors, or knew that the payments were the product of fear.[4] The possibility that the jury might give a benevolent interpretation, as sought by defendants, made other evidence tending to show knowledge and malevolent intent especially significant.

Nick LaPapa and Joe Lascola both testified to prior extortionate dealings by Schweihs. Schweihs argues that this testimony was inadmissible because the prior alleged extortionate dealings were dissimilar from the conduct charged, and the evidence created hostility in the jury and resulted in unfair prejudice against Schweihs. Schweihs further argues that admission of this evidence of prior bad acts constructively amended the indictment in violation of the fifth amendment.

Nick LaPapa testified that in 1986 he had just returned home from the hospital when Schweihs visited him. LaPapa was president of a service employees' labor union. Schweihs told LaPapa that he wanted to be partners with LaPapa in the union and that if LaPapa did not agree he would hurt him very badly. LaPapa testified that he feared Schweihs and knew that he had a reputation as a violent person. LaPapa could not give Schweihs an immediate answer, and finally, Schweihs gave him a week to decide but threatened him again as he left.

Schweihs set up another meeting with LaPapa to request that LaPapa remove certain union officers and replace them with Schweihs' friends. When LaPapa said that he could not remove the officers, Schweihs threatened to break the officers' legs and force them to resign. After this meeting, LaPapa went to the FBI. Wearing a body recorder, LaPapa met with Schweihs in a restaurant. Schweihs re-

---

**4.** The recent decision of the United States Supreme Court in *Evans v. United States,* — U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), is not to the contrary. In *Evans,* the Court held that affirmative acts of inducement were not required to prove a violation of the Hobbs Act by extortion "under color of official right." Inducement is still required to prove a Hobbs Act violation by a private individual. *Id.* at 1888.

ferred to the first meeting in LaPapa's home and mentioned the name of a union employee from whom he wanted LaPapa to get money. LaPapa became angry and told Schweihs that he had had no right to come into his home and threaten him and his family. Schweihs then became angry and stormed out of the restaurant.

Joe Lascola testified that when he opened a beef stand in 1981 Schweihs convinced the city to remove a traffic island, thus improving access to the beef stand. Lascola had not asked Schweihs to do this. Schweihs then began to comment that Lascola and he were partners in the beef stand. There was also evidence tending to show that Schweihs spent six months reconstructing a bar owned by Lascola. Lascola did not request his help and did not pay him for his time. Schweihs made all of the decisions about how the bar would be reconstructed. After the reconstruction was finished, Lascola testified that Schweihs would not allow him even to enter the bar.

Schweihs and Lascola appeared to be friends. They went to the Super Bowl together in 1984 and had dinner together about four times per week. Lascola also attended two Schweihs family weddings. Lascola testified, however, that he became increasingly fearful of Schweihs and knew about his reputation as a violent person.

Lascola testified that Schweihs insisted that Lascola apply for a loan to buy Schweihs a house in Lascola's name. Lascola applied for the loan out of fear of Schweihs, but falsified the application so that the loan was refused. Schweihs then became angry with Lascola saying that he could not trust him. There was evidence tending to show that Schweihs then forced Lascola to turn over one-half of the beef stand to Schweihs' son. The evidence tended to show that Lascola received no money for the one-half interest in the beef stand but turned it over nonetheless out of fear for his life.

Judge Williams allowed admission of this testimony for the limited purpose of showing Schweihs' intent to instill fear in the victims and/or his knowledge of the impact of his actions on the victims. During the trial she frequently instructed the jury on the limited use of this evidence.

**1.**

■ We review a district court's decision to admit Rule 404(b) evidence of prior bad acts for an abuse of discretion. *United ed States v. Robinson*, 956 F.2d 1388, 1395 (7th Cir.1992). To be admissible under Rule 404(b), Fed.R.Evid., the evidence must (1) be directed toward proving a matter in issue other than the defendant's propensity to commit the crime charged, (2) show that the prior act is similar enough and close enough in time to be relevant to the matter in issue, (3) be such that a reasonable jury could find that the act occurred and that the defendant committed the act, and (4) meet the requirement of Rule 403 that the evidence's probative value not be substantially outweighed by the danger of unfair prejudice. *United States v. Monzon*, 869 F.2d 338, 344 (7th Cir.), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

■ The LaPapa and Lascola testimony was directed toward proving Schweihs' intent and/or knowledge, and Judge Williams gave a limiting instruction to that effect. Other crimes or wrongs are, generally, admissible to prove intent and knowledge. Fed.R.Evid. 404(b) (1990). Prior acts evidence is admissible to prove intent if intent is automatically in issue or the defendant puts it in issue. *United States v. Gruttadauro*, 818 F.2d 1323, 1327 (7th Cir.1987). When the crime charged requires proof of a specific intent as an element of the crime, intent is automatically in issue because intent is then a material element required to be proved by the government. Thus, the government may use prior acts evidence in its case-in-chief, provided Rules 404(b) and 403 are fulfilled. *United States v. Shackleford*, 738 F.2d 776, 781 (7th Cir.1984). When intent is not an element of the crime, prior acts evidence may not be submitted in the government's case-in-chief unless the government has reason to believe that the defense will raise intent as an issue. *Id.*

In this case, the Hobbs Act does not require proof of a specific intent. Intent and knowledge, therefore, are not automatically in issue, but may be placed in issue by the defendant. Thus, the government should not be allowed to present prior acts evidence in its case-in-chief unless it has reason to believe that the defense will raise intent and/or knowledge as an issue. As determined by the district court, the government did have ample reason to believe that Schweihs would raise intent and/or knowledge as an issue. The transfer of property element was clearly proven by several videotapes showing Wemette paying tax moneys to Schweihs, and the transfers were not disputed. The only disputed issues were whether Schweihs induced these payments through the wrongful use of fear and knew they were so induced. It was likely that Schweihs would argue that he never intended to instill fear in the victims, had no knowledge of their fear, and was only boasting or making chitchat with friends when he discussed his organized crime connections. Indeed, in his opening statement Schweihs argued just that. He asserted that Wemette came to him for help and that he was only doing favors for a friend and was not attempting to instill fear. It was not an abuse of discretion for the district court to find that Schweihs' intent and knowledge were disputed.

The LaPapa and Lascola extortions occurred close enough in time to the acts charged to make the evidence relevant to Schweihs' intent and knowledge. The substantive crimes charged against Schweihs, excluding the conspiracy charge, occurred in 1987 and 1988. The events related by LaPapa occurred only one year before in 1986. Lascola testified to a continuum of events which started in 1981 and ended with the transfer of one-half of his business in 1985, only two years before the crimes charged. We have previously found other acts occurring within two years of the crime charged to be relevant to prove intent. *United States v. O'Brien*, 618 F.2d 1234, 1238 (7th Cir.), *cert. denied*, 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980); *United States v. Lea*, 618 F.2d 426, 432 (7th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). We have also previously found a group of prior acts to be admissible when the last act occurred right before the crime charged. *United States v. Radseck*, 718 F.2d 233, 236–37 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). The district court did not abuse its discretion in deciding that the LaPapa and Lascola extortions were close enough in time to the crimes charged.

Schweihs' methods were similar in all of the alleged extortions. Schweihs used his organized crime connections and his known reputation for violence to instill or perpetuate fear in LaPapa, Lascola and Wemette. Schweihs did not make any express threats to Wemette as he did to LaPapa. There was evidence tending to show that Wemette had, over a period of many years, accepted the fact that he had to pay the "street tax" in order to protect himself and his business. Recognizing this, Schweihs may have concluded that express threats were not necessary to induce the payments, but that occasional references to his organized crime connections and intimations to his reputation for violence would sufficiently preserve Wemette's fear.

In addition, Schweihs did favors for both Lascola and Wemette thus creating a feeling of indebtedness, and Schweihs attempted to form partnerships with all three men. This shows a pattern of similar acts. "Patterns of similar acts may show intent." *United States v. Beasley*, 809 F.2d 1273, 1278 (7th Cir.1987). The LaPapa and Lascola extortions were sufficiently similar to support an inference of criminal intent. "The prior acts need not be duplicates of the ones for which the defendant is now being tried." *Radseck*, 718 F.2d at 236. Therefore, the fact that Schweihs did not collect "street tax" payments from either LaPapa or Lascola and that the threats on LaPapa's life were more explicitly stated does not make the prior acts dissimilar for the purpose of proving intent and knowledge.

The evidence of prior acts must also be sufficiently reliable that a reasonable jury

could find that the act occurred and that the defendant committed the act. *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).[5] The LaPapa and Lascola testimony met this burden. Live testimony from the victims of the prior acts themselves was sufficient evidence for the jury to find that the prior acts were actually committed by Schweihs. *Cf., Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (previous victim's testimony admissible as 404(b) evidence even though defendant acquitted of previous crime). The reliability of the testimony depended entirely upon the credibility of LaPapa and Lascola, also a jury issue.

Finally, the prior acts evidence must meet the requirement of Rule 403 that its probative value not be substantially outweighed by the danger of unfair prejudice. As explained above, the express threats and demands in the LaPapa and Lascola extortions tended to show Schweihs' intent to threaten and instill fear in Wemette and Schweihs' knowledge that Wemette's payments were induced by threats and fear. The explicit nature of the prior acts could have had a tendency to inflame the jury. However, Judge Williams gave limiting instructions before LaPapa's and Lascola's testimony and occasionally reminded the jury of that limited purpose during the testimony, thus reducing the possibility of unfair prejudicial effect. Although the threats against LaPapa were more explicit than in the other two extortions, any danger of unfair prejudice from LaPapa's testimony was lessened by his testimony that he ultimately refused to yield to Schweihs' demands and that he was not harmed as a result of that refusal.

 The determination of whether the probative value of evidence outweighs its risk of unfair prejudice is normally left to the discretion of the district court, and when that discretion has been exercised, it will rarely be disturbed. *United States v. Boroni*, 758 F.2d 222, 225 (7th Cir.1985);

*Beasley*, 809 F.2d at 1279. The appellate courts can add little to these decisions; once the factors have been weighed by the district court, there is little to be gained from reweighing them at the appellate level. *Beasley*, 809 F.2d at 1278. In a memorandum opinion, the district court identified the 404(b) exception applicable to the evidence and evaluated the probative value of the evidence relative to the risk of unfair prejudice. *United States v. Schweihs*, No. 88 CR 763, 1989 WL 105197, 1989 U.S.Dist. Lexis 10423 (N.D.Ill. Aug. 30, 1989). We cannot say that the district court abused its discretion in allowing evidence of the LaPapa and Lascola extortions.

**2.**

 Schweihs argues that admission of the prior acts evidence constructively amended the indictment to charge two additional extortions. The facts do not support this claim. The evidence of prior extortions in this case was not presented to the jury as an alternate basis for conviction. The district judge gave thorough and frequent instructions to the jury that the prior acts evidence was presented only to show Schweihs' intent and/or knowledge and that they should remember that Schweihs was not on trial for or charged with extortion of LaPapa or Lascola. Thus, the jury was never presented with any additional charges upon which they could have convicted Schweihs.

**B. Redaction**

Another characteristic of the conversations between Schweihs and Wemette is Schweihs' use of very coarse language—a steady stream of "four letter" vulgar words and derivatives thereof. Occasionally, in relating some occurrence, he would refer to someone as a member of a particular racial or ethnic group, sometimes, but not always, in a derogatory context. Sometimes, but not always, he used an offensive epithet to describe someone's race or ethnicity. It seems fair to say, after listening

---

**5.** Prior to *Huddleston* this court required the government to prove by clear and convincing evidence that the defendant committed the sim-

ilar act. *United States v. Hudson*, 884 F.2d 1016, 1020 (7th Cir.1989), *cert. denied*, 496 U.S. 939, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990).

to the tapes, that while derogatory references to someone's race and use of offensive appellations for racial and ethnic groups are surely present, they do not bulk large in the total conversations.

■ Schweihs argues that his racially derogatory remarks should have been redacted from the videotapes. Rule 403, Fed. R.Evid., applies to the redaction decision. The district court must determine whether the racially derogatory remarks have sufficient probative value to outweigh any risk of unfair prejudice. In reviewing the district court's balancing process, this court will overturn a decision refusing redaction only if the district court either failed to exercise its discretion or exercised it in an unprincipled way. *United States v. Frasch*, 818 F.2d 631, 634 (7th Cir.1987).

■ We have previously suggested a principled method for dealing with redaction requests. First, the district court should carefully consider whether substitution or deletion of the offensive language would damage the probative value of the evidence. If the offensive language has probative value, then the district judge should question the venire panel using the actual offensive language that the jury will hear during the trial. *Id.*

■ Prior to trial, Judge Williams considered, pursuant to a defense motion in limine, the probative value of the offensive language, both that which was racially or ethnically derogatory and that which was coarse and vulgar. She redacted certain portions of one of the tapes because she found those portions to contain offensive language the context of which was unrelated to any element of the crime charged. She found the other offensive language or its context to be relevant to the defendant's character or image as portrayed to his victims, and as such, she found it probative of his intent to instill fear in his victims. She found that removing the offensive language would destroy the probative value of the evidence. *United States v. Schweihs*, No. 88 CR 763, 1989 WL 105190, 1989 U.S.Dist. LEXIS 10443 (N.D.Ill. Aug. 30, 1989).

The district judge's decision not to redact the offensive language was a principled exercise of her discretion. As we suggested in *Frasch*, she carefully considered whether deletion or substitution of the offensive language would destroy the probative value of the evidence. We have viewed the tapes and examined their transcriptions. Schweihs' use of coarse and vulgar language is so extensive that its deletion would likely make the tapes incomprehensible, and the content of the tapes is relevant to Schweihs' method of instilling fear or exploiting a preexisting fear through numerous references to violence and his organized crime connections. We also agree that Schweihs' extensive use of this type of language was part of his character or image which he used to create fear in his victims. It was also relevant to illustrate the reasonableness of the victims' fear by realistically depicting the encounters between Wemette and Schweihs.

The racially derogatory remarks, on the other hand, were not always made in the context of relevant discussions, some of these remarks were made as asides. However, we agree that the remarks were relevant to the character or image portrayed by Schweihs and to the reasonableness of the victims' fear. Even if these remarks were irrelevant, we hold that their admission was harmless error. In viewing the tapes, we found the remarks to be fleeting having little impact overall. The remarks were brief, and in the context of the volumes of tapes shown to the jury, we think that these comments could not have so inflamed the jury as to change its decision.

We conclude that Judge Williams did not abuse her discretion in determining that redaction of the coarse and vulgar language and racially derogatory remarks would have damaged the probative value of the evidence. Judge Williams then properly followed our suggestion in *Frasch* and questioned the venire panel using the actual offensive language. Judge Williams extensively questioned the jury about the offensive language and racial remarks and gave many examples of the language on the tapes. (Tr. at 191–95, 196–97.) The recital of examples alone filled several

pages of the transcript. In our view this direct questioning of the venire panel decreased the risk of unfair prejudice at trial. Therefore, we find no abuse of discretion.

### C. Defense Witness Immunity

 The rule in this circuit is that the federal courts do not have the power to grant immunity to a witness absent a request from the U.S. Attorney. *United States v. Herrera–Medina*, 853 F.2d 564, 568 (7th Cir.1988). Congress conferred that power exclusively on the executive branch. 18 U.S.C. § 6003 (1989); *United States v. Frans*, 697 F.2d 188, 191 (7th Cir.), *cert. denied*, 464 U.S. 828, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983). The prosecutor's power to refuse to seek immunity is limited by the defendant's right to due process. *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir.1988). We "will not review a prosecutor's immunization decisions in the absence of substantial evidence showing that the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause." *United States v. Taylor*, 728 F.2d 930, 935 (7th Cir.1984) (quoting *United States v. Wilson*, 715 F.2d 1164, 1173 (7th Cir.1983)). An abuse of discretion occurs when the prosecutor uses his or her immunization authority in such a manner as intentionally to distort the fact-finding process. *Frans*, 697 F.2d at 191.

 The Assistant U.S. Attorney (AUSA) originally asked the U.S. Attorney to request immunity for Toushin, but the U.S. Attorney refused. The AUSA intended to call Toushin as a witness to establish the interstate commerce connection for COUNTS 14 and 15. The U.S. Attorney determined that immunity was not necessary to the public interest because other modes of proof of the interstate commerce connection were available. (R. at 152.) Schweihs has not presented any evidence to show that the U.S. Attorney had some other and improper motive for denying the request.

Neither has Schweihs presented evidence to show that the denial of immunity had even a potential to distort the fact-finding process. As the district judge noted, COUNTS FOURTEEN and FIFTEEN charged an attempt and a solicitation to extort Toushin, and Schweihs has not shown that Toushin knew anything about the plans to extort him. Schweihs asserts that Toushin could offer testimony concerning the relationship between Schweihs and Wemette, but does not give any basis for that assertion beyond the fact that Toushin and Wemette lived on the same street and were involved in the same business. In addition, other defense witnesses testified to the relationship between Schweihs and Wemette and the fear of Wemette in the community, thus the testimony would be purely cumulative. The evidence at trial also showed that Schweihs implied involvement in two local murders. Schweihs asserts that Toushin could have testified that he, not Schweihs, was responsible for the murders. Schweihs' actual involvement in the murders, however, was irrelevant. The material issue was whether Schweihs' implications of involvement, regardless of his actual involvement, caused Wemette reasonably to fear him.

 Schweihs argues that the government's prior request for immunity is inconsistent with its position here that immunity was properly denied. The prior request, Schweihs argues, must have contained an assertion that immunity was in the public interest, but when immunity was requested by the defense the government asserted that it was not in the public interest. The AUSA's opinion, possibly embodied in the request, that immunity was necessary to the public interest was not binding upon the U.S. Attorney. The U.S. Attorney is authorized by statute to make the final immunity decision, 18 U.S.C. § 6003, and his or her decision becomes the official position of the government. A difference of opinion between the AUSA and U.S. Attorney is irrelevant.

There is not substantial evidence to show a clear abuse of discretion in this case. Not only has no improper intent been shown, but the irrelevant and cumulative nature of the expected testimony makes it highly unlikely that its absence distorted

the fact-finding process or was intended so to do. Thus, there is no basis for finding that the government's refusal to request immunity rendered the conviction a denial of due process. *See, Herrera–Medina,* 853 F.2d at 568.

### D. Sentencing

#### 1.

Schweihs challenges several aspects of Judge Williams' sentencing decision under the Sentencing Guidelines. First, Schweihs argues that the seven offense level upward departure was inappropriate. Judge Williams determined that the Guidelines did not take into account the use of organized crime connections in committing an offense, and because of the harm caused by organized crime, she held that some departure was appropriate. She then analogized the use of organized crime to the discharging of a firearm which warranted a five level increase under § 2B3.2(b)(2)(A). Judge Williams considered the use of organized crime to be worse than the discharging of a firearm because of the wide-spread societal implications. She, therefore, increased his offense level by seven levels.

 Schweihs argues that the Hobbs Act itself encompasses the use of organized crime to instill fear in the victim. If the underlying crime, affecting commerce by extortion, requires proof of organized crime connections, then the Sentencing Commission could be assumed to have adequately taken the organized crime connections into consideration in formulating the Sentencing Guidelines for that crime. *See, United States v. Ferra,* 900 F.2d 1057, 1064 (7th Cir.1990), *cert. denied,* — U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992) (fact that fences make burglary more profitable and lead to more burglaries is part of heartland of the offense and, as such, is not a reason to depart). We review a district court's decision to depart from the Guidelines to determine whether it was reasonable in light of the district court's explanations for its departure. 18 U.S.C. § 3742(e)(3) (1990); *United States v. Schmude,* 901 F.2d 555, 558 (7th Cir.1990).

] The language of the Hobbs Act, codified at 18 U.S.C. § 1951 (1987), does not suggest a Congressional intent to limit its application to those with organized crime ties. The Act punishes

> [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section ...

18 U.S.C. § 1951(a) (1987). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1987). Nowhere does the Act state that the fear must be induced by exploitation of organized crime connections. In fact, the words of the statute "do not lend themselves to restrictive interpretation; as we have recognized, they 'manifest ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'" *United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978) (quoting *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)). In *Culbert* the Supreme Court held that Congress had not intended to limit the scope of the Hobbs Act to violations including "racketeering." The same reasoning applies to the inclusion of an organized crime element and convinces us that proof of organized crime connections is not required for violation of the Hobbs Act. The Second Circuit agrees that the Hobbs Act is not limited to prosecutions involving organized crime. *United States v. Daley,* 564 F.2d 645, 650 (2d Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978).

 Since an organized crime connection is not an element of the Hobbs Act offense, it could not have been taken into

consideration by the Sentencing Commission in determining the appropriate base offense level for that offense under Sections 2E1.5 and 2B3.2(a). The specific offense characteristics do not include organized crime connections under Section 2B3.2(b). Therefore, Judge Williams appropriately considered use of organized crime connections to be an aggravating circumstance "not adequately taken into account by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553 (1989); U.S.S.G. § 5K2.0, p.s. (1989). In addition, this and other courts have previously suggested that gang and organized crime connections might provide an appropriate basis for departure. *United States v. Thomas*, 906 F.2d 323, 328 (7th Cir.1990); *United States v. Cammisano*, 917 F.2d 1057, 1064 (8th Cir.1990).

■■■ We must now consider whether the amount of the departure was appropriate. The degree of departure must be linked to the structure of the Guidelines. As long as the district court's findings as to the appropriate degree of departure adequately reflect the structure of the Guidelines, we will give deference to those findings. *United States v. Gaddy*, 909 F.2d 196, 199 (7th Cir.1990).

■■■ This is not a case like *Ferra*, 900 F.2d at 1063–64, where the district judge gave no explanation for the degree of his departure. Judge Williams analogized the use of organized crime to one of the aggravating factors listed in the extortion guidelines. She found the use of organized crime to be most analogous to the discharging of a firearm which required increasing the offense level by five levels, U.S.S.G. § 2B3.2(b)(2)(A) (Nov. 1989). She then determined that the analogy was not perfect and that the use of organized crime was more harmful than the discharging of a firearm. Thus, she concluded that it warranted a larger departure than the discharging of a firearm and increased by two more levels. Analogy is an appropriate method for determining the amount of departure when the Guidelines lack sufficient detail to take account for a particular aggravating or mitigating circumstance.

*Ferra*, 900 F.2d at 1062. We hold that the district court's findings, based upon analogy, adequately reflect the structure of the Guidelines, and thus, we defer to the district court's determination of the appropriate degree of departure.

### 2.

Judge Williams also increased Schweihs' offense level by four levels for being a leader of criminal activity involving five or more participants, as prescribed in U.S.S.G. § 3B1.1(a). *U.S. v. Schweihs*, 733 F.Supp. 1174, 1179–80 (N.D.Ill.1990). Judge Williams based this conclusion on evidence from the videotaped conversations. Schweihs told Wemette that he and Eboli were partners and that he had assumed power over the Chicago "Outfit" after Eboli's death. Judge Williams also found that Schweihs exhibited decision-making authority in his discussions with Wemette about taking over Toushin's business.

■■■ The determination that Schweihs played a leadership role in the conspiracy is a factual determination to which we must defer unless it is clearly erroneous. *United States v. Thompson*, 944 F.2d 1331, 1348 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). We have found substantial support in the record, arising from Schweihs' own assertions to Wemette, for the finding that Schweihs was a leader within the organized crime community. As noted by the district court, he told Wemette himself that he was Eboli's partner and had taken over leadership of the organization after Eboli's death. However, these findings alone do not support an enhancement for a leadership role in the offense.

■■■ "The plain language of Guidelines § 3B1.1 requires that the sentencing court focus on the 'defendant's role in the offense,' rather than other criminal conduct." *United States v. Tetzlaff*, 896 F.2d 1071, 1074 (7th Cir.1990) (quoting U.S.S.G. § 3B1.1). The offense level may be increased by four levels "if the defendant was an organizer or leader of a criminal activity that involved five or more partici-

pants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The guidelines commentary defines participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n. 1). The purpose of the enhancement is to take into account the relative responsibility of the participants. *Tetzlaff*, 896 F.2d at 1074; U.S.S.G. Ch. 3, Pt. B, intro. comment.; U.S.S.G. § 3B1.1, comment. (backg'd).

▇▇▇ The conspiracy to extort Wemette and Cross involved at least three participants. The defendant, Schweihs, is counted as a participant in the offense. *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991); *See also, United States v. Herrera*, 878 F.2d 997, 1002 (7th Cir.1989) (defendant and his wife considered to be more than one participant for application of Section 3B1.1). Daddino, as a codefendant, was obviously a second participant in the conspiracy. Daddino referred to Lou Eboli as his "boss," and Schweihs referred to Eboli as his partner, thus by the defendants' own statements Eboli was the third participant in the conspiracy. Several other names, Joe Lombardo, Marshall Caifano, and Phil Amato, surfaced in connection with the collection of the "street tax" over the entire period of payments from 1974 to 1988. It is unclear from the sentencing record whether these alleged organized crime figures were involved in the conspiracy to extort Wemette and Cross.

We do not doubt that the Chicago "Outfit" included more than five persons, but the district court must identify five participants in this offense, a conspiracy to extort Wemette and Cross, in order to enhance the offense level by four levels under Section 3B1.1(a).[6] The sentencing record does not reflect such a finding. Once five participants have been identified, the district court must also determine whether Schweihs exhibited leadership of or control over all of the five participants. *See, United States v. McGuire*, 957 F.2d 310, 317 n. 4 (7th Cir.1992). Thus, we vacate the sentence and remand to the district court for resentencing.

### 3.

▇▇▇ Schweihs further challenges the court's decision that his computed criminal history category did not adequately reflect the seriousness of his past criminal conduct. The court considered conduct underlying a reversed conviction for possession of a wire communication intercepting device. The conviction was reversed by the Fifth Circuit because the device was not designed *primarily* for surreptitious interception of wire communications as required by the statutory language, but the decision recited the other facts found by the jury. *United States v. Schweihs*, 569 F.2d 965 (5th Cir.1978). A sentence resulting from a reversed conviction is not counted in computing criminal history. The district court, however, relied upon Section 4A1.3, which the court noted permits consideration of reliable information indicating that "the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." U.S.S.G. § 4A1.3.

▇▇▇ The guidelines commentary to the instructions for computing criminal history provides, "Sentences resulting from convictions that have been reversed or vacated because of errors of law ... are not to be considered ... Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity." U.S.S.G. § 4A1.2, comment. (n. 6). The reversed conviction, therefore, could be considered under Section 4A1.3 if it provided reliable evidence of past criminal activity. *See, Gaddy*, 909 F.2d at 201. The Fifth Circuit opinion makes clear that Schweihs was in fact using the device for the surreptitious interception of wire communications at the time

---

**6.** The district court could enhance by two levels based solely upon Schweihs' control over and leadership of Daddino. U.S.S.G. § 3B1.1(c).

of his arrest, although one element of the charged offense was not proved. Thus, the court could consider that Schweihs had engaged in criminal activity, including a violation of 18 U.S.C. § 2511(1)(a), prohibiting the intentional interception or attempted interception of wire communications. The district court's departure was, therefore, proper.

■ Schweihs argues that the past criminal conduct must be similar to the offense of conviction to be considered as a reason for departure. Section 4A1.3(e) provides that "information concerning ... prior similar adult criminal conduct not resulting in a criminal conviction" can trigger departure. This, however, is just one example of information which might warrant a departure. Section 4A1.3 expressly provides that the list is not exhaustive. Application note 6 also supports the conclusion that similarity between the prior conduct and the offense of conviction is not necessary. Note 6 requires only that the uncounted invalid or reversed conviction provide reliable evidence of prior criminal activity. U.S.S.G. § 4A1.2, comment. (n. 6).

Schweihs cites *United States v. Schmude*, 901 F.2d 555 (7th Cir.1990), and *United States v. Williams*, 901 F.2d 1394 (7th Cir.1990), *vacated on other grounds,* —— U.S. ——, 111 S.Ct. 2845, 115 L.Ed.2d 1014 (1991), for the argument that this court requires a similarity between the prior criminal conduct and the offense of conviction. These cases indicate that one appropriate reason for departure is the fact that prior criminal conduct, which may or may not have been included in the original criminal history computation, was similar in kind to the conduct being sentenced. *Schmude*, 901 F.2d at 559; *Williams*, 901 F.2d at 1398–99. If reliable information indicates that the defendant has committed the same offense more than once, this may demonstrate a need for greater sanctions to deter him from committing the same offense again. *Schmude*, 901 F.2d at 559.

Neither of these cases states that departure is not permitted unless the prior criminal conduct and the offense of conviction are similar.

In fact, as noted in *United States v. Connor*, 950 F.2d 1267, 1274 (7th Cir.1991), this court allowed an upward departure in *United States v. Williams,*[7] 910 F.2d 1574, 1578–79 (7th Cir.1990), *vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992),[8] for prior dissimilar crimes more than fifteen years old although application note 8 to section 4A1.2 appears explicitly to limit the use of old crimes as a basis for departure to those evidencing similar misconduct. In contrast, application note 6, relating to the use of uncounted invalid or reversed convictions as a basis for departure, does not mention similarity, but requires only that the uncounted invalid or reversed conviction provide "reliable evidence of past criminal activity."

Prior dissimilar criminal conduct, underlying a reversed conviction, may indicate that the criminal history category underrepresents the seriousness of the defendant's past criminal conduct, especially since the reversed conviction will not have been considered in the original criminal history computation, creating no danger of double counting. Reliable evidence of prior criminal conduct, underlying a reversed conviction and, thus, not previously considered in determining the criminal history, may also be particularly important when the original criminal history category is I, as here, thus possibly improperly indicating a first-time offender.

■ Schweihs also challenges the degree of the criminal history departure. The question of degree of departure is entirely one of reasonableness, and we give considerable leeway to a district court's determination of the criminal history category that most accurately reflects the defendant's true criminal history. *Schmude,*

---

**7.** This case is unrelated to the prior cited *Williams* case.

**8.** The Supreme Court recognized but declined to resolve the conflict among the circuits on whether the use of non-similar outdated convictions as a basis for departure is prohibited by application note 8.

901 F.2d at 560. Judge Williams determined that if Schweihs' prior conviction had not been reversed it would have added three points to his criminal history score, but she decided to add only two points because she felt that some distinction should be made for a reversed conviction. Judge Williams then compared Schweihs prior conduct with the conduct of other defendants having a category II criminal history and determined that his acts were commensurate with the conduct of others sentenced in category II. In determining the degree of departure, Judge Williams appropriately compared Schweihs' conduct to that of others in the higher category and used, as a reference, the guideline range for the category that most closely resembled Schweihs' criminal history. *Schmude*, 901 F.2d at 559; U.S.S.G. § 4A1.3, p.s. We conclude that the district court did not abuse its discretion in determining the degree of departure.

#### 4.

■ Schweihs challenges the district court's increase in the offense level by two points for multiple counts pursuant to Section 3D1.4. The court grouped COUNTS ONE and SIX through THIRTEEN but sentenced for COUNT FIFTEEN as a separate count. Schweihs argues that COUNT FIFTEEN should have been grouped with the other counts because, as provided in U.S.S.G. Ch. 3, Pt. D, intro. comment., it was so closely intertwined with the other counts that it did not warrant an increase in the guideline range. This policy is carried out in the grouping guidelines, U.S.S.G. § 3D1.2, which set out criteria for determining which counts are so closely intertwined that an increase is not warranted. COUNT FIFTEEN does not qualify for grouping with the other counts under any of these criteria. Under both Sections 3D1.2 (a) and (b), the counts must involve the same victim. COUNT FIFTEEN involved Toushin as the victim of an attempted extortion, while the other counts involved Wemette and Cross as the victims.

### III. DEFENDANT DADDINO

#### A. Severance

■ Daddino filed pretrial motions for severance and a separate trial. The district court denied his motions, and Daddino appeals those denials requesting that this court vacate his conviction and remand for a new trial separate from Schweihs.

Daddino, first, argues that the admission of the LaPapa and Lascola evidence against Schweihs prejudiced the jury against him and denied him a fair trial. Daddino asserts that the district court erred in not granting him a severance and a separate trial.

COUNT ONE charged a conspiracy among Schweihs, Daddino and others to affect interstate commerce by extortion of Wemette and Cross. COUNTS TWO through FOUR charged both with attempts to commit the substantive offense. COUNTS FIVE through THIRTEEN charged only Schweihs with similar attempts which were part of the same series of acts in carrying out the conspiracy as COUNTS TWO through FOUR. Rule 8(b), Fed.R.Crim.P., provides, "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count." As to COUNTS ONE through THIRTEEN, Schweihs and Daddino were properly joined under Rule 8(b) because all of the acts were part of a common conspiracy.

■ Once the Rule 8 requirements for joinder are met, severance is controlled by the requirements of Rule 14, Fed. R.Crim.P. *United States v. Balzano*, 916 F.2d 1273, 1280 (7th Cir.1990). Rule 14 provides that the court may order a severance if it appears that the defendant will be prejudiced by the joinder of defendants for trial. The decision on a motion for severance under Rule 14 is within the discretion of the district judge, and we will reverse

only upon a showing of a clear abuse of discretion. *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985). In deciding a severance motion the district judge should give deference to the strong public interest in having jointly indicted defendants tried together, particularly where, as here, the indictment charges a conspiracy which may be proved by evidence arising out of the same series of acts. *Id.* "Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion." *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). In order successfully to challenge denial of a severance motion, a defendant must show actual prejudice resulting from the joinder. *Id.* "Actual prejudice means that the defendant could not have a fair trial without severance, 'not merely that a separate trial would offer him a better chance of acquittal.' " *Id.* (quoting *United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977)).

We decided essentially the same issue in *United States v. Briscoe*, 896 F.2d 1476, 1516–18 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). In *Briscoe* several of the defendants claimed that they were prejudiced by the introduction of 404(b) evidence against their codefendants. In that case the district court had carefully instructed the jury, immediately before introduction of the evidence and at the end of the trial, that the 404(b) evidence was only to be considered in regard to certain defendants. In light of the instructions given to · the jury and the unsupported nature of the defendants' assertion that the jury was unable to follow those instructions, we held in *Briscoe* that the defendants had not shown actual prejudice from the joinder. *Id.* at 1518.

In this case, Judge Williams frequently reminded the jury that the 404(b) evidence of the LaPapa and Lascola extortions was admitted only for the limited purpose of showing Schweihs' intent and/or knowledge and that they were not to consider the evidence for any reason or purpose against Daddino. This instruction was repeated in the final jury instructions as well.

In determining whether a joinder has caused actual prejudice, we will consider "whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant." *Moya–Gomez*, 860 F.2d at 768 (quoting *United States v. Cavale*, 688 F.2d 1098, 1107 (7th Cir.1982)). This was not a particularly complex case; COUNTS ONE through THIRTEEN involved a simple ongoing conspiracy to extort moneys from two victims. It was obvious from the evidence that Daddino had no part in the LaPapa and Lascola extortions. We generally assume that the jury followed the jury instructions, *United States v. McAnderson*, 914 F.2d 934, 949 (7th Cir.1990), and we see no reason to depart from that assumption here. Juries are normally presumed to be capable of sorting through evidence· and considering separately the charges against codefendants. *Briscoe*, 896 F.2d at 1517. As in *Briscoe*, there is nothing to show that the jury was unable to follow the instructions. We· hold that Daddino has failed to make a showing of actual prejudice from the introduction of 404(b) evidence against Schweihs.

Daddino, next, argues that the joinder of COUNTS FOURTEEN and FIFTEEN with COUNTS ONE through THIRTEEN was impermissible because COUNTS FOURTEEN and FIFTEEN charged Schweihs alone with independent acts of extortion, unrelated to the conspiracy charged in the other counts, against an unrelated victim. COUNTS FOURTEEN and FIFTEEN could be joined with the other counts in a prosecution of Schweihs alone because they were offenses of the same or similar character. Fed.R.Crim.P. 8(a). As discussed above, Schweihs and Daddino could · be charged with COUNTS ONE through THIRTEEN in the same indictment under Rule 8(b). The question is whether these

two rules can be combined to allow joinder of the defendants along with joinder of the charges, including those against Schweihs alone, in the same indictment.

The government may not combine the two subsections of Rule 8 in order to charge multiple defendants with offenses of similar character. *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). In *Velasquez*, all of the defendants were charged with a cocaine trafficking conspiracy and in a separate count one defendant was charged with an unrelated sale of heroin. We held that there was a misjoinder with respect to the heroin charges because there was no evidence to suggest that the other defendants were involved in the heroin sale or that the heroin sale was part of a common plan that included the cocaine sale. Although we noted that the heroin charges could have been joined with the other charges in an indictment against the heroin-trafficking defendant alone, we stressed that the test for joining those charges with the charges against the other defendants was more stringent under Rule 8(b). *Velasquez*, 772 F.2d at 1353.

Similarly, there was no evidence to show that Daddino was in any way connected with the attempted extortion of Toushin, and although the offenses were both extortions, there was no evidence to show that the Toushin extortion was part of Daddino's and Schweihs' plan to extort Wemette. Thus, there was a misjoinder with respect to COUNTS FOURTEEN and FIFTEEN.

A misjoinder "requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). In making this determination of whether the misjoinder was harmless, we may consider the effect of appropriate limiting instructions charging the jury to consider the guilt or innocence of each defendant individually. *Id.* at 450 n. 13, 106 S.Ct. at 732 n. 13.

In this case, we are convinced that the misjoinder did not have a substantial and injurious influence on the jury's verdict. There was substantial evidence of Daddino's participation in the plan to extort Wemette, thus the jury would likely have found him guilty without the misjoinder of COUNTS FOURTEEN and FIFTEEN. The evidence of the Toushin extortion was not particularly inflammatory because it involved only an attempted extortion in which the victim was never contacted and was unaware of the extortionate plans. Moreover, the evidence of the plan to extort Toushin would likely have been admissible as 404(b) evidence probative of Schweihs' intent in a trial on COUNTS ONE through THIRTEEN. The district court also instructed the jury that although the defendants were being tried jointly the jury was required to give separate consideration to each defendant and analyze only the evidence admitted against that defendant leaving out of their consideration any evidence admitted only against the other defendant. The court pointed out that only Schweihs was charged in COUNTS FOURTEEN and FIFTEEN.

## B. Jury Instructions

Daddino challenges the district court's refusal to give two of his proposed jury instructions, one on withdrawal from the conspiracy and the other on the elements of extortion. The district court refused to give any instruction on withdrawal from the conspiracy because it found no evidence in the record to support a finding of withdrawal by Daddino. The district court gave an instruction on the elements of extortion but did not use the wording proposed by Daddino.

### 1.

Generally, a defendant is entitled to an instruction on any defense recognized in the law and supported by sufficient evidence to allow a reasonable jury to find in the defendant's favor. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). The defendant bears the burden of coming forward

with evidence of withdrawal, but once the defendant advances sufficient evidence, the prosecution must disprove the defense of withdrawal beyond a reasonable doubt. *United States v. Read*, 658 F.2d 1225, 1236 (7th Cir.1981).

Daddino argues that the evidence supported an instruction on his withdrawal from the conspiracy. A reasonable jury could have found that on October 1, 1987, Wemette, according to Schweihs' instructions, told Daddino not to come to his place anymore and that Daddino responded, "Okay, buddy," and was never seen by Wemette again. The issue is whether this evidence was sufficient to raise a withdrawal defense and place the burden upon the government to disprove that defense.

■■■■■ Withdrawal requires more than a mere cessation of activity on the part of the defendant; it requires some affirmative action which disavows or defeats the purpose of the conspiracy. *United States v. Andrus*, 775 F.2d 825, 850 (7th Cir.1985); *See also, United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). Daddino argues that because Schweihs "kicked him out" of the conspiracy Daddino's abandonment of the conspiracy had been communicated to his coconspirators, as required in *Patel*. This argument is not consistent with the language and underlying policies in the *Patel* decision.

In *Patel* we recognized, as did the Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978), that there may be other ways of withdrawing from a conspiracy aside from making a clean breast to the authorities or communicating one's abandonment of the conspiracy to one's coconspirators. *Patel*, 879 F.2d at 294. However, in *Patel* this court emphasized the policy considerations underlying the stringent requirements for asserting the withdrawal defense. Examination of these policy considerations indicates that withdrawal requires an affirmative action *by* the defendant.

> [H]aving set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitively, to participate ... You do not absolve yourself of guilt of bombing by walking away from the ticking bomb. And similarly the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation.

*Id.* Daddino walked away from a ticking bomb. There was no evidence to show that Daddino was no longer associated with Schweihs or the "Outfit." Without evidence of some affirmative action by Daddino, Daddino could continue silently to endorse the extortion plan although he had been relieved of the duty to participate physically by collecting the "street tax" payments. We hold that withdrawal requires proof of an affirmative action by the defendant and that, since there was no such action in this case, the district court properly denied the withdrawal instruction.

■■■■■ Daddino also argues that statements made by Schweihs after Daddino's alleged withdrawal could not properly have been considered against him as coconspirator's statements under Rule 801(d)(2)(E), Fed.R.Evid. That rule provides that statements made by a party's coconspirator during the course and in furtherance of the conspiracy are not hearsay and are, therefore, admissible against the party. Daddino does not argue that the statements were not made during the course and in furtherance of the conspiracy. Instead, he argues that he had previously withdrawn from the conspiracy, ending Schweihs' status as a coconspirator. As we explained above, Daddino did not withdraw from the conspiracy,[9] and Schweihs' statements during the course and in furtherance of the conspiracy

---

9. In order for a coconspirator's statements to be admissible, the district court need only find the existence of the conspiracy and the defendant's participation in that conspiracy by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987).

were admissible as statements of a coconspirator.

### 2.

Daddino's proposed jury instruction on the elements of extortion was based upon the Seventh Circuit Pattern Jury Instruction. The district court declined Daddino's proposed instruction and instructed the jury that the government had presented evidence of two theories under which the charges of attempting to interfere with commerce by extortion could be found by the jury. Under the first theory the court instructed that the jury must find that the government proved, "First, that the defendant either knowingly obtained or attempted to obtain money from the person named in that count of the indictment with that person's consent; second, that the defendant did so by wrongful use of fear ..." The court instructed that under the second theory the government was required to prove, "First, that the defendant either knowingly obtained or attempted to obtain money from the person named in that count of the indictment with that person's consent, and, second, that the defendant did so by the wrongful use of threatened force or violence ..." (Tr. at 1829–30.) Daddino objected, arguing that these jury instructions omitted the third part of the Seventh Circuit Pattern Jury Instruction which requires the jury to decide whether "the defendant knew that the person described in [that] count parted with property because of the extortion." Fed.Crim.Jury Instructions, 7th Cir., Vol. III at 66.

 In reviewing a district court's selection of a particular jury instruction, we must view the evidence in the light most favorable to the government. *United States v. Diaz*, 864 F.2d 544, 551 (7th Cir. 1988), *cert. denied*, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). As long as the jury instructions, viewed as a whole, address the issues fairly and adequately, we will not interfere with the district court's selection. *id.* Although the third part of the pattern jury instructions, requested by Daddino, was not included in the main jury instruction on the elements

of extortion, the defendant's knowledge that the victim parted with the property because of the extortion was addressed in other sections of the jury instructions. At a later point, Judge Williams stated,

Now, it is defendant Anthony Daddino's theory of the case that ... Daddino never knew that the payments were made because of fear ... and Daddino was not aware that the payments were made because of implied threats or force.

If upon consideration of all of the evidence in the case you agree that ... defendant Daddino did not know that the payments were induced by either fear or implied threats, then you should return a verdict of not guilty as to defendant Daddino. (Tr. at 1835.)

Judge Williams also instructed the jury as to the meaning of the word "knowingly."

When the word knowingly is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake or accident. (Tr. at 1826.)

Given these additional instructions, we conclude that the jury instructions, as a whole, fairly and adequately addressed the issue of Daddino's knowledge that the victim parted with the money because of extortion.

### C. Sentencing

The government has conceded that the district court erred in increasing Daddino's criminal history category from I to II based upon a prior sentence of imprisonment from which Daddino was released more than fifteen years prior to the commencement of the crimes charged. As a result, we will not address the merits of the district court's sentencing decision but will remand the case to the district court for resentencing of Daddino under criminal history category I.

### IV. SUFFICIENCY OF THE EVIDENCE

 Both defendants challenge the sufficiency of the evidence to show that Wemette and Cross reasonably feared them. A

defendant bears a heavy burden in challenging a conviction for insufficient evidence, and we will reverse only if a rational juror could not have been convinced beyond a reasonable doubt that the evidence, viewed in the light most favorable to the government, supported the defendant's guilt. *United States v. Balistrieri,* 778 F.2d 1226, 1232 (7th Cir.1985), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986).

 In the light most favorable to the government, the evidence clearly supports Schweihs' guilt. Wemette and Cross both testified as to their fear of Schweihs and their knowledge of his reputation for violence and his connections with organized crime. Wemette and Cross testified that Schweihs' references to these connections and his discussion of certain local murders frightened them. They testified that they feared physical or economic harm if they did not pay the "street tax." A rational juror could have found Schweihs guilty beyond a reasonable doubt.

 Schweihs also argues that there was not sufficient evidence to show that he solicited Wemette and Cross to participate in a scheme to extort Toushin. Schweihs asserts that it was the other way around with Wemette soliciting him. We believe, however, that there was sufficient evidence on the videotapes, when taken in the light most favorable to the government, to show that Schweihs solicited Wemette and Cross. The videotapes show Schweihs asking Wemette and Cross to follow Toushin and find out personal information about him, including the types of cars he drove and his daily schedule. The videotapes show Schweihs as devising plans to "deal" with Toushin, and they depict Schweihs as the organizer among the three men.

 The evidence also supports Daddino's guilt. Wemette and Cross testified that several organized crime figures had informed them that they had to pay the "street tax" in order to avoid harm. Daddino frequently spoke of his connections to persons known to be associated with organized crime. He mentioned his connection to Lou Eboli whom he said was not only involved in the Chicago "Outfit" but was the "boss." Daddino also told Wemette of the Chicago "Outfit's" ties to the Genovese organized crime family on the east coast. The jury could infer that these references were designed to instill or exploit Wemette's fear and that Daddino was implicitly threatening Wemette.

## V. CONCLUSION

The convictions are AFFIRMED. The sentences are VACATED and the case REMANDED for resentencing consistent with this opinion.