UNITED STATES of America,
Plaintiff–Appellee,

v.

Tommy R. SCARBROUGH and Lars A.
Brannholm, Defendants–Appellants.

Nos. 91–1782, 91–1833.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1992.

Decided March 29, 1993.

Mark D. Stuaan, Asst. U.S. Atty. (argued), Indianapolis, IN, for U.S.

Suzanne Philbrick (argued), Chesterton, IN, Richard M. Malad, Cohen & Malad, Indianapolis, IN, for Tommy R. Scarbrough.

Dennis E. Zahn (argued), Ober, Symmes, Cardwell, Voyles & Zahn, Indianapolis, IN, for Lars A. Brannholm.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Tommy Scarbrough was convicted of conspiracy to violate the National Firearms Act, 26 U.S.C. § 5801–72, and the Gun Control Act of 1968, 18 U.S.C. § 921–30, as amended by the Firearms Owners' Protection Act of 1986, 18 U.S.C. § 922(o). Lars Brannholm was convicted of conspiracy to violate the Arms Export Control Act, 22 U.S.C. § 2778. The men were tried separately and convicted; Brannholm by a jury and Scarbrough by a judge. On appeal, both men claim that the government presented insufficient evidence of the conspiracy. We disagree and affirm their convictions.

## I.

Lars Brannholm is a Swedish citizen. In October 1990, he came to the United States to buy American cars and car parts to resell in Sweden. Brannholm used Scarbrough Auto Parts in Indianapolis, a scrap yard, as his base of operations. Brannholm had been making these trips for about twelve years because the import business was quite profitable. (B. III/8–13).[1] Brannholm took home more than auto parts however. He smuggled alcohol and cigarettes in his containers to avoid export regulations and tariffs. On some occasions, he also smuggled guns and ammunition to resell in Sweden. (B. III/20, 32–36) (B.Govt.Exh. 32A).[2]

United States Customs Service and the Department of Alcohol, Tobacco, and Firearms got wind of Brannholm's pattern and devised a sting operation. Customs and ATF enlisted two men, Jimmy Skelton and Don Knapp, to sell Brannholm guns. Both Skelton and Knapp used tapped telephones and wore body recorders during the course of the sting. Skelton and Knapp were friends of the Scarbrough brothers, Jim "Jimbo", Michael "Whitey", and Tommy. Neither Skelton nor Knapp knew Brannholm well enough to approach him about the guns. (B. I/29–30; II/7). They needed a go-between, and tried to use Whitey. Whitey's drug use made him unreliable, so they decided to use Tommy. (S. I/46–47). Tommy was the next natural choice because he regularly tried to peddle different items to Brannholm to ship back to Sweden, such as car parts. He also sold him cocaine. (S. II/81) (B.Govt.Exh. 32A).

Skelton was the first to contact Tommy Scarbrough about selling guns to Brannholm. Between August 1990 and October 1990, Skelton spoke to Tommy thirteen times about the guns. (B. I/24, 59). The guns to be sold were a machine gun and two pistols, a .45mm and a .9mm. (Govt.Exh. 8). Skelton told Tommy that the guns were military surplus and had been taken off the computers so they could not be traced. (S. I/87). Although Tommy was eager to help sell the guns, the sales were never consummated.

Not long after Skelton's role faded, Knapp approached Tommy about selling some guns to make some quick money. (Govt.Exh. 15). He told Tommy that the guns were from a drug dealer who wanted to unload them because they had been used in a shoot-out the night before. (Govt.Exh. 16). For two days in October 1990, Knapp met with Tommy and Brannholm to set up a gun deal. Knapp taped most of those meetings with a body recorder worn in the small of his back just beneath his belt. On October 18, Knapp showed Tommy a Mac–10 machine gun with a silencer and two Smith & Wesson .9mm pistols that he wanted to sell. Knapp suggested Brannholm as a possible buyer. (B. II/7–9). While Knapp was showing Tommy the guns, Tommy saw the bulge of the recorder and became suspicious. He questioned Knapp about it, and Knapp told him it was his wallet. Tommy responded by saying "[o]ne with a tape in it. Let me see it." Knapp then told him it was a gun. Tommy pestered Knapp to show the gun, but Knapp successfully distracted Tommy and was not forced to reveal the ruse. (Govt.Exh. 16). Knapp left after he and Tommy decided to talk to Brannholm the next day about buying the guns.

On October 19, Knapp went back to the yard. To defuse any suspicion Tommy might have from seeing the recorder the night before, Knapp did not wear the recorder, but instead carried a disabled handgun in the place where the recorder had been. He made sure Tommy could see the gun. (S. I/127, 133; B. II/23).[3] Knapp did

---

1. Throughout the record, citations to transcripts will be made by indicating "B." for Brannholm and "S." for Scarbrough. The government's exhibit numbers correspond for both trials. The roman numeral designations indicate the appropriate transcript volume. The arabic numerals indicate the appropriate page within that volume.

2. Government Exhibit 32A–C is a taped statement Brannholm made to Customs and ATF agents, and was introduced only at his trial.

3. Knapp's testimony at Tommy's trial was sketchy on this issue. In context, however, it is clear that Knapp did not wear a recorder but did have a recording device in his car.

not bring the guns to the October 19 noon visit to the yard. When Tommy found out, Knapp testified that Tommy told him "the deal's off then." (S. I/129). Knapp reassured Tommy he could get the guns, but told Tommy that he sold one of the handguns and only had one left. (S. I/130). Tommy reported the information to Brannholm. When Tommy came back, he told Knapp that "we're only to sell [Brannholm] the machine gun for five hundred dollars" because "I want the 59 for myself." (S. I/131). That meant that Tommy wanted the price to include the cost of the remaining Smith & Wesson model 59 pistol that Tommy intended to keep for himself. (S. I/131).

Knapp then approached Brannholm directly. Knapp testified that Brannholm agreed to buy the machine gun, (B. II/34), and that Brannholm asked whether he could get him a pistol with a silencer. (B. II/35, 67). Knapp told Brannholm he would check with his source. Knapp and Brannholm agreed Knapp should come back later with the guns and ammunition. (B. II/35). After Knapp left the yard, he met with ATF and Customs agents to report on what had just transpired. The report did not indicate that Brannholm agreed to buy the guns from Tommy or Knapp, despite Knapp's assertion that the entire purpose of his meeting with the agents was to convey Tommy's and Brannholm's agreement. (B. II/72).

Later that afternoon Knapp returned to the yard. Knapp was confident that Tommy's fears had been allayed, so again he donned the body recorder. Tommy greeted Knapp and urged him to hurry and get the guns so they could do the deal. Knapp told him the drug dealer was still sleeping, but he would bring the guns back that night. Knapp also spoke with Brannholm. Brannholm asked Knapp to buy him ammunition and additional gun clips because he could not buy them in Sweden without a license. (Govt.Exh. 18). Knapp told Brannholm he could get the ammunition but not the clips. (B. II/34–35). The men agreed that they would consummate the deal the following day because Knapp did not have the gun with him, and because Brannholm was not

finished loading the containers. (B. II/35; Govt.Exh. 18). Brannholm was planning to ship the containers out of the country on October 22. (B. III/20). Brannholm was not licensed to buy or export a firearm. (B. III/44).

Although Tommy and Brannholm seemed convinced of Knapp's cover, Jimbo was not similarly persuaded. Jimbo warned Brannholm to stay away from Knapp because he was working for the government. (B. III/43). Because of Jimbo's suspicions, when Knapp returned later with the Mac-10, Jimbo ran him off the yard. (B. II/48; III/43). The next day the agents arrested Brannholm. That night Brannholm met with agents from Customs and ATF and spoke at length about his purpose for being in the United States, his business transactions, and the events surrounding his arrest. Tommy was arrested about a week later.

At his trial, Brannholm testified that he did not want to buy the machine gun, but wanted only to see it. (B. III/15). Brannholm did not testify at Tommy's trial. Likewise, Tommy did not testify at Brannholm's trial. At his own trial, however, Tommy testified that he believed his role in the gun transactions was merely letting one friend (Brannholm) know that another friend (Knapp) had some guns for sale. (S. II/80, 88). Tommy stated that he and Brannholm never discussed gun registration, licenses, or Brannholm's plans for the gun. He claimed he never agreed to sell the machine gun or keep the pistol. (S. II/47–48).

## II.

A conspiracy is a confederation of at least two people who have joined together to commit a criminal act. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). Tommy was convicted of conspiring with Brannholm to commit three illegal acts: First, to receive and possess an unregistered firearm, a violation of 26 U.S.C. § 5861(d); second, to transport a destructive device (the machine gun) in interstate or intrastate commerce, a violation of 18 U.S.C. § 922(*o*); and third, to unlawfully

transfer ownership of a gun, a violation of 18 U.S.C. § 922(a)(4). Brannholm was convicted of conspiring to illegally transport the machine gun out of the United States, a violation of 22 U.S.C. § 2778.

██ Defendants challenging the sufficiency of the evidence bear a heavy burden. They must show that no rational trier of fact, considering the evidence in the light most favorable to the government, could find that they committed the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *United States v. Schweihs,* 971 F.2d 1302, 1325 (7th Cir. 1992). To prove conspiracy under 18 U.S.C. § 371, the government must show that 1) the defendants agreed to accomplish an illegal objective; 2) the defendants performed at least one overt act in furtherance of the illegal objective; and 3) the conspirators intended to commit the substantive offense. The prosecution must present substantial evidence of the defendants' participation in the conspiracy. *Durrive,* 902 F.2d at 1229.

Central to both men's challenges is their contention that no agreement was reached, and without such an agreement, no conspiracy could have existed. Conspiracies are secret by their very nature, so an agreement to conspire may be established by circumstantial evidence, including reasonable inferences drawn from the defendants' conduct and overt acts. The government need not show evidence of a formal agreement.

The pivotal evidence against Brannholm and Tommy is Knapp's testimony and the taped conversations.

*A. Lars Brannholm*

██ Circumstantial evidence and the reasonable inferences drawn from that evidence may be the sole support for a conspiracy conviction. The primary issue here is determining whether Brannholm or Knapp was more credible and what reasonable inferences the jury could draw from their testimony. Brannholm testified that he never agreed to buy the machine gun. Knapp testified that Tommy told him

Brannholm agreed to buy the gun from Tommy. (B. II/25). He also testified that Brannholm told him directly that he wanted to buy the gun. (B. II/29). The jury decided Knapp was more credible, and unless we face extraordinary circumstances, we cannot reweigh the jury's decision. *United States v. Gutierrez,* 978 F.2d 1463, 1469 (7th Cir.1992). Extraordinary circumstances exist when the testimony is so outrageous that it is incredible as a matter of law. This testimony must be unbelievable on its face, because it would be physically impossible for the witness to observe that which he or she claims to have seen, or the object of the testimony would be impossible under the laws of nature. *United States v. Grandinetti,* 891 F.2d 1302, 1307 (7th Cir. 1989). We do not face those circumstances here.

Brannholm cites *United States v. Wieschenberg,* 604 F.2d 326 (5th Cir.1979), to support his argument that the government did not provide sufficient evidence of his agreement with Tommy to buy Knapp's gun. In *Wieschenberg,* the Fifth Circuit considered whether sufficient evidence supported conspiracy convictions for two men who were convicted of illegally attempting to sell advanced technological equipment to a foreign buyer without a proper export license. The evidence showed that the alleged conspirators discussed the export license requirement and their need to obtain the license before selling the equipment. The license application required the defendants to name the foreign buyer, so before they could apply for the license, the defendants had to negotiate with potential customers. The evidence revealed ongoing negotiations to find a buyer for the equipment, but did not indicate whether the defendants intended to procure the export license. Because no buyer had been found, and no direct evidence showed that the defendants intended to avoid the licensing requirement, the government could not prove that the defendants had agreed to export the equipment illegally. The court refused to infer that discussions about the disputed conduct were in furtherance of the illegal activity because the discussions

could just as easily have been in further-ance of legal activity. The court reversed the convictions. *Id.* at 332–36.

*Wieschenberg* is distinguishable from this case. There, record either contradict-ed the prosecution's theory of the case or was silent. In that situation, the silence could have supported inference of legal or illegal activity. That is not true in this case. Brannholm wanted ammunition for the Mac–10 because he could not get it in Sweden without a license. The jury could have reasonably inferred that Brannholm wanted to take ammunition back to Sweden because he was also planning to take the Mac–10 back to Sweden. The jury knew that the containers were to be closed and shipped to Sweden within two days of Brannholm's arrest. (B. III/20). The jury also knew that Brannholm did not possess any of the appropriate firearm licenses. (Govt.Stip. 26). The jury could have rea-sonably inferred that Brannholm would not secure the necessary licenses before he left the country.

We considered a disputed "agreement" in a gun conspiracy in *United States v. Butz,* 784 F.2d 239 (7th Cir.1986). In that case, two men were charged with the same firearms conspiracy. The prosecution's principal witness, Richard Madeja, was an unindicted co-conspirator. The jury con-victed Butz, but acquitted his codefendant. Butz' conviction, therefore, depended the existence of a Butz–Madeja conspiracy. The government could not establish the conspiracy, and conceded that Butz and Madeja had never reached an independent "meeting of the minds" or agreement. *Id.* at 240–41. Because no conspiracy existed between Butz and Madeja, and because a conspiracy could not exist with the acquit-ted alleged co-conspirator, we reversed Butz' conviction.

*Butz* is distinguishable from this case. There, the record was completely devoid of evidence of a direct conspiracy or an indi-rect "middleman" conspiracy between Butz

and Madeja. Here, the evidence estab-lished that Brannholm agreed to buy from Tommy the Mac–10 machine gun that Knapp supposedly obtained from a drug dealer. This is evidence of a "middleman" conspiracy that was lacking in *Butz.* The government presented sufficient evidence to support Brannholm's conviction.

### B. Tommy Scarbrough

■ Tommy, like Brannholm, claims no agreement was ever reached to sell the machine gun. Knapp, however, testified that when he was at the yard in the early afternoon of October 19, Tommy came over to him to check the availability of the guns. Knapp told him he only had one pistol left because he had sold the other. According to Knapp, Tommy reported this informa-tion to Brannholm, then came back and told Knapp that they "we're only to sell [Brann-holm] the machine gun for five hundred dollars" because Tommy wanted to keep the remaining pistol for himself. (S. I/131). Tommy's testimony is similar to Knapp's, except Tommy contended that Brannholm wanted to see the gun, not buy the gun. (S. II/43). Tommy denied that he would have received the extra pistol or any money from the gun deal. (S. II/46). Again, the issue is one of witness credibili-ty. Tommy opted for a bench trial. The judge found Knapp more credible, and we will not upset that decision in the absence of extraordinary circumstances.

Alternatively, Tommy argues that he did not possess the requisite intent to commit the underlying crimes, so he could not pos-sess the requisite intent to conspire. Be-cause Knapp initiated and encouraged the weapons sale, Tommy claims that he was not a willing participant in the conspiracy. Tommy relies on *United States v. Sababu,* 891 F.2d 1308 (7th Cir.1989). In that case we considered a wide ranging conspiracy by FALN [4] members to procure weapons and murder a weapons dealer as part of a plan to escape from Leavenworth prison. In *Sababu,* two FBI informants played key

---

4. FALN is an acronym for Fuerzas Armadas de Liberacion Nacional Puertorriquena (Armed Forces of Puerto Rican National Liberation). The organization is a "clandestine terrorist

group dedicated to the violent overthrow of United States rule over Puerto Rico." *Sababu,* 891 F.2d at 1312–13.

roles in the conspiracy. Neither of the informants cooperated with the FBI until after an escape had been planned. *Id.* We stated that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." *Id.* at 1327 (quoting *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932)). In *Sababu,* the artifice was allowing the FALN members to believe that the informants had contacts with gun dealers and that one of the informants was coordinating the escape activities outside Leavenworth at the prisoners' instructions. We held that the government's conduct was not so outrageous to warrant reversal of the convictions. *Id. Sababu* demonstrates that before a conspirator will be found to have been an unwilling participant, the government agent must do more than merely contribute to the conspiracy. *Id.*

*Sababu* does not support Tommy's argument. Knapp presented Tommy and Brannholm with the opportunity to buy guns. The deal would have benefitted Tommy because he was going to keep one of the pistols for himself and make some quick cash. The government presented the opportunity for Tommy to commit the crime; it did not force him to take advantage of that opportunity. *See United States v. Jones,* 950 F.2d 1309, 1314 (7th Cir.1991) (entrapment defense depends on defendant's predisposition to commit the offense and government's inducement). Knapp merely contributed to the conspiracy, he did not drive it singlehandedly. After all, Tommy admitted that he told Knapp to "[l]et me take care of business." (S. II/71).

Tommy's next argument is that he did not possess the intent necessary to commit the crime. To prove intent to commit conspiracy, the prosecution must show that Tommy possessed the requisite intent to commit the underlying crime. *United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir.1991). Tommy believed that Knapp's guns came from a drug dealer who was anxious to sell them because they had been used in a shoot-out the night before. (S. I/120). Tommy admitted that he was not licensed to sell guns, and did not inquire if Brannholm was licensed to buy them. (S. II/79–80). Despite this, Tommy agreed to sell Brannholm a gun. (S. II/76–77). The evidence was sufficient to show Tommy's intent to receive and possess an unregistered firearm, 26 U.S.C. § 5861. *See United States v. Esposito,* 867 F.2d 388, 391 (7th Cir.1989) (defendant admitted he did not possess, nor could he reasonably believe he possessed, the authority to deal a machine gun). Tommy's agreement to sell Brannholm the Mac–10 established his intent to violate 18 U.S.C. § 922(a)(4), unlawful transfer of gun ownership. We may reasonably infer that Tommy knew that Brannholm would take the guns to Sweden, which fulfills the intent requirement of 18 U.S.C. § 922(*o*), unlawful transport of a destructive device (the machine gun) in interstate or intrastate commerce.

### III.

Considering the evidence of the defendants' actions presented at trial, and drawing all reasonable inferences on behalf of the government, we conclude that Brannholm agreed to buy the gun from Tommy, and intended to ship it to Sweden. Their alliance was more than mere association, *see Durrive,* 902 F.2d at 1227 (conspiracy requires more than mere knowledge or approval of illegal scheme), and establishes a conspiracy. We AFFIRM both convictions.