UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard F. TYLKOWSKI and Timothy P. Tylkowski, Defendants–Appellants.

Nos. 93–1423 and 93–1424.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1993.

Decided Nov. 18, 1993.

Brenda Atkinson (argued), Barry R. Elden, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

David P. Schippers, Schippers & Gilbert, Chicago, IL (argued), for Richard F. Tylkowski.

David P. Schippers (argued), Schippers & Gilbert, Chicago, IL, Neil L. Calance, Waukegan, IL, for Timothy P. Tylkowski.

Before BAUER, and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

KANNE, Circuit Judge.

In this case a father (Richard Tylkowski) and his son (Timothy Tylkowski) were convicted of a variety of firearms violations arising out of the sale of five M–11 semi-automatic rifles which had been converted into fully automatic machine guns. Richard claims the evidence against him was primarily circumstantial and insufficient for a conviction. He also asserts evidentiary errors occurred regarding the admission of co-conspirator statements and prior "bad act" evidence. Timothy says that if there was insufficient evidence to convict his father, his own conspiracy conviction must fall as well.

I. *Background*

Because the case against Richard is based, in large part, on circumstantial evidence we will dwell at some length on the facts of the case.

During the first week of June 1992, Louis Andino, a member of the Maniac Latin Disciples street gang, met with an individual who offered to sell him firearms. Andino contacted the United States Secret Service and provided them with this information. Because

the Secret Service does not investigate firearms violations, they referred Andino to Special Agent Joseph Ruzevich of the Bureau of Alcohol, Tobacco and firearms ("ATF"). Andino told Ruzevich that an individual named Dan Stanton told him that Stanton knew a third party who could sell Andino's gang armor-piercing bullets and automatic weapons. Andino agreed to be a confidential informant for the ATF and took Ruzevich to meet Stanton at a bar in Fox Lake, Illinois on or about June 9, 1992. Nothing came of this meeting. However, Andino agreed to continue providing Ruzevich with information concerning illegal weapons sales.

Subsequently, Andino's girlfriend, Becky Ramberg, introduced Andino to Timothy at Timothy's home in Spring Grove, Illinois. During that meeting, Timothy told Andino that he understood Andino was interested in purchasing automatic weapons for his gang. Timothy then showed Andino two weapons, including a M–11, and told him that he would have to check Andino out before he sold him any weapons. Accordingly, Timothy instructed Andino to fill out part of a gun license application with his name, address, and social security number. Timothy told Andino that he would check with "his people" to see if they could provide the guns and quoted a price of $900–$1,200 for each M–11. Andino asked Timothy whether the M–11s would be converted into machine guns and was told that "his people" could show Andino how to convert one weapon so that Andino could then convert the additional weapons himself. Andino responded that he did not want to pay the additional money necessary to convert the guns and did not want to take the risk that he might ruin them during the conversion process. No definite date for delivery was set because Timothy expressed a desire to get to know Andino better before completing the deal. Timothy also threatened that if anything went wrong, his people were very powerful and would take it out on Andino and Ramberg.

Timothy and Andino spoke to each other several times after their initial meeting, but Timothy would not discuss the pending illegal weapons sale over the phone. On August 3, 1992, Andino and Ramberg visited Timothy at his home for a second time. During that visit, Timothy informed Andino that his associates would convert the M–11s into machine guns and scratch out their manufacturer's serial numbers. However, the price of the guns would increase to $1,500 per weapon.

On September 13, Timothy called Andino and told him to come over to his house to pick up several dogs on the 14th and to bring only Ramberg with him. Andino informed Timothy that he did not have a car and would have to get someone to drive him to Timothy's house. Timothy told Andino to make sure that the person from whom he got the ride knew nothing about the illegal gun sale. Thinking that Timothy also planned to have the guns available, Andino informed Ruzevich, who agreed to accompany him to Timothy's house.

On September 14, Andino, Ramberg, and Agent Ruzevich went to Timothy's house. Andino was wearing an electronic transmitting device, which allowed several nearby ATF agents to overhear a private conversation between Timothy and Andino. During that conversation, Timothy informed Andino that the serial numbers on the M–11s had been obliterated, but they would not be converted into machine guns until the day before delivery. Andino asked Timothy if he could lower the price several hundred dollars. Timothy responded that he would have to check with his associates. Timothy also informed Andino that the money and the guns would never be at the same place at the same time.

The next day, Timothy called Andino and informed him that the deal would take place in several days and confirmed that the price would remain at $1,500 for each M–11. Timothy called again on September 16 to tell Andino that the sale would occur on the 17th and that he would call him then with final details.

On September 17, Timothy called Andino and told him to bring $7,500 for the five converted machine guns to the Burger King restaurant on Route 12 in Fox Lake, Illinois at 7:00 p.m. that evening. Timothy reiterated that the money and the guns would never be at the same place at the same time and

that he would have people watching the deal. At approximately 6:00 p.m., Timothy called his father, Richard.

Around 7:00 p.m. that evening, Ruzevich and Andino met Timothy in the Burger King parking lot. Timothy instructed Ruzevich to park his car in the back of the parking lot and to unlock the rear passenger side door. Timothy informed Andino that they would have to leave the parking lot so that Timothy could count the money. Ruzevich objected to this plan and told Timothy that he wanted to complete the deal right there. Timothy responded by repeatedly demanding that Ruzevich get into car, telling him that "I've been told what to do, you're going to fuck it up" and that "I can't tell this guy what to do. He's telling me what to do." Timothy threatened Ruzevich that if he would not get into the car and consummate the deal as he had planned, the deal would be off.

During the discussion between Timothy and Ruzevich, ATF surveillance agents observed Richard drive slowly by the Burger King restaurant apparently performing counter-surveillance. Richard then parked his car nearby. After much discussion, Timothy finally informed Ruzevich that his orders were to take Ruzevich and Andino back to his house, so that he could count the money and telephone his associate to deliver the guns to Ruzevich's car. Ruzevich finally consented to Timothy's demand and all three of them got into Timothy's car.

While in the car, Timothy repeatedly told Ruzevich that he would be very pleased with the guns and that Timothy had personally fired them on the 16th and that they were indeed fully-automatic weapons. Timothy also told Ruzevich that his associate wanted to make sure that Ruzevich and Andino were who they claimed to be, because the first time he saw Ruzevich, he thought he looked like an undercover police officer. When Ruzevich stated that he understood the need to be cautious, Timothy said "I keep it in the family too," and "[i]f you can't keep it in the family, who can you trust?" Timothy also informed Ruzevich that the guns were "clean" and were contained in sealed boxes. Timothy told Ruzevich not to open the boxes because if he were stopped by the police, they could not legally open the sealed boxes and if they did, it would be an illegal search.

Once inside Timothy's house, Ruzevich handed Timothy $7,500, which Timothy counted and placed in a back room. At 7:25 p.m., Timothy called a public phone located outside the Kwik Pantry approximately one-half mile from the Burger King restaurant and stated: "I received the 75. Mr. R? 5 is a go, go ahead and deliver the 5." Five minutes later, at approximately 7:30 p.m., Richard drove into the Burger King parking lot and pulled into the parking space next to the driver's side of Ruzevich's car. Richard subsequently backed out of that spot and backed into another parking spot on the passenger side of Ruzevich's car. Wearing white gardening gloves, Richard then opened the rear passenger door of the car, walked back to his car, opened the trunk and removed two brown cardboard boxes which he placed into the back seat of Ruzevich's car. Richard was arrested as he walked back to the trunk of his car.

ATF agents found three more brown cardboard boxes in the truck of Richard's car, which were lying near a loaded .44 magnum revolver. Each box contained a M–11 semi-automatic weapon which had been illegally converted to fire fully automatic. The M–11s were now capable of firing 900 rounds per minute. Each individual number within the manufacturer's serial number on the guns had been bored out with a drill. ATF agents also removed a drill and a case of drill bits from the back seat of Richard's car. Timothy was arrested as he drove Andino and Ruzevich back to the Burger King parking lot.

The next day, ATF agents searched Richard's home, which was also the location of his firearms distribution business, and found a .22 caliber weapon which had been modified in a way consistent with an attempt to convert the rifle into a machine gun. The agents also found a M–16 rifle, with an obliterated serial number, which had been converted to accept a machine gun receiver so that it could fire fully automatic.

Agents also found a small notebook containing the phone numbers of two public

telephones located outside the Kwik Pantry and the number of a public phone located outside a McDonald's restaurant approximately one-half mile from the Burger King restaurant. One of the phone numbers was the one Timothy called at 7:25 p.m. on September 17. The notebook also contained a notation regarding five kits used to convert M–11 semi-automatic weapons into fully automatic weapons.

Metal shavings were also discovered on the floor of Richard's workroom which were consistent with shavings that could have been formed by drilling metal.

Both Richard and Timothy were convicted of three counts of firearms violations.[1] Richard was sentenced to three concurrent 78 month terms of imprisonment, and Timothy received three concurrent 97 month terms of imprisonment.

## II. *Richard Tylkowski*

Richard raises four issues on appeal: (A) whether there was sufficient evidence to support the jury's guilty verdict; (B) whether Timothy's acts and declarations were properly admitted against Richard under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(e); (C) whether two weapons seized from Richard's home were properly admitted into evidence pursuant to the so-called "prior bad acts" provision, Fed. R.Evid. 404(b); and (D) whether the district court erred in denying his motion to sever under Fed.R.Crim.P. 14.

### A. *Sufficiency of the Evidence*

■ Richard initially contends that there was insufficient evidence to support the jury's verdict that he conspired to knowingly possess illegally converted machine guns with obliterated manufacturer's serial numbers or that he knowingly possessed such weapons. As we have frequently stated in the past, "[d]efendants challenging the sufficiency of the evidence bear a heavy burden. They must show that no rational trier of fact, considering the evidence in the light most favorable to the government, could find that they committed the crime beyond a reasonable doubt." *United States v. Scarbrough*, 990 F.2d 296, 299 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 121, 126 L.Ed.2d 85 (1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Schweihs*, 971 F.2d 1302, 1324–325 (7th Cir.1992)).

Specifically, Richard argues that his conspiracy and possession convictions cannot stand because the government failed to prove that he knew the firearms he possessed and transferred were illegally converted machine guns with obliterated manufacturer's serial numbers. The evidence admitted at trial and the reasonable inferences drawn therefrom refute this contention.

There was substantial evidence admitted at trial that Timothy was engaged in an illegal conspiracy with some other party. Richard concedes that the evidence shows that "some other person [besides Timothy] must have actually procured, altered and defaced the guns." However, contrary to Richard's assertions, a rational trier of fact certainly could have found beyond a reasonable doubt that Richard was the "some other person" acting as Timothy's co-conspirator.

Timothy's own statements provide a reasonable inference that his father was the other person involved in the conspiracy.[2] For example, Timothy indicated that his co-conspirator was a member of his family: "I keep it in the family too" and "[i]f you can't trust your family who can you trust?" Moreover, the events of September 17 confirm

---

1. Each defendant was charged as follows. Count one: conspiring to (1) unlawfully possess and transfer unregistered firearms (18 U.S.C. § 922(*o*)); (2) knowingly possess a firearm which had the serial number obliterated (18 U.S.C. § 922(k)); and (3) knowingly receive and possess a firearm not identified by a serial number (26 U.S.C. § 5861(i) and 5871). Count two: unlawful possession and transfer of unregistered firearms (18 U.S.C. § 922(*o*)). Count three: posses-

sion of a firearm with a obliterated serial number (18 U.S.C. § 922(k)).

2. Inasmuch as we find that there was sufficient evidence to support the jury's verdict that Richard and Timothy were co-conspirators, Timothy's acts and declarations made "during the course and in furtherance of the conspiracy" were properly admitted against Richard because they are not hearsay under Fed.R.Evid. 801(d)(2)(E).

that Richard was Timothy's co-conspirator in the illegal machine gun transaction.

Richard does not dispute that he was heavily involved in delivery of the converted machine guns. ATF agents observed Richard drive slowly by the Burger King parking lot during Timothy's discussion of the pending weapons deal with Andino and Ruzevich. A reasonable inference is that Richard was performing counter-surveillance to make sure that the deal was not being monitored by the authorities. After Timothy returned home from the Burger King parking lot and received payment for the guns, he called a pay phone located outside the Kwik Pantry near the Burger King restaurant and stated: "I received the 75. Mr. R? 5 is a go, go ahead and deliver the 5." Shortly thereafter, Richard drove into the Burger King parking lot, creating a strong inference that he was the Mr. R. that Timothy was referring to on the telephone.

The fact that Richard wore gloves on a warm September evening in transferring the weapons also shows that he knew that he was involved in an illegal transaction. A reasonable inference is that Richard wore gloves so that his fingerprints would not be found on the boxes that he transferred to Ruzevich's car or on the car itself. Furthermore, Richard had a loaded .44 caliber revolver in the trunk of his car. This supports the inference that Richard believed that he was delivering illegal weapons to street gang members who might pose a safety risk.

The physical evidence found at Richard's home/business also indicates that he was intimately involved in the conspiracy to sell converted machine guns with obliterated serial numbers. For example, there was the notebook which contained the phone numbers of two public telephones located outside the Kwik Pantry, including the number Timothy called shortly before Richard delivered the weapons. A logical inference is that Richard obtained these numbers so that Timothy would be able to inform Richard when he had received payment for the weapons and when it was safe to deliver them. Also contained in the notebook was a reference to five kits used to convert M–11 semi-automatic weap-

ons into machine guns. This is exactly the same type and number of weapons that Timothy offered to sell Andino.

There was also the altered weapons found in Richard's home. A .22 caliber rifle had been partially modified so that it could easily be converted into a machine gun. In addition an M–16 rifle, with an obliterated serial number, had been converted to accept a machine gun receiver.[3] Metal shavings consistent with the method used in obliterating serial numbers were found in Richard's workroom. ATF agents also removed a drill and a case of drill bits from the back seat of Richard's car. Circumstantially, this evidence provides a strong inference that Richard was knowledgeable about the processes used to convert semi-automatic weapons into machine guns and how to remove their serial numbers.

In the face of this substantial circumstantial evidence Richard admits that "a reasonable jury may have concluded, at worst, that he intended to participate in some nefarious activity, or even illegally to deliver firearms without proper identification and away from his place of business." However, Richard argues that there was no evidence that he knew that the sealed boxes contained illegally converted machine guns with obliterated serial numbers. Therefore, Richard contends, he did not have the requisite knowledge to be convicted. We reject this argument.

■ It is well recognized that circumstantial evidence and reasonable inferences drawn from that evidence can be used to satisfy the government's burden of establishing that the defendant had the knowledge necessary to commit the crime. *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir. 1985) ("knowledge can be inferred from circumstantial evidence"). In this case, the government presented evidence that Richard exercised dominion and control over the sealed boxes by transporting them in his own vehicle and by transferring them to Agent Ruzevich's car. It is a reasonable inference that a person exercising control and dominion over a sealed container knows of its

---

**3.** *See* section III discussing the admission of this evidence pursuant to Fed.R.Evid. 404(b).

contents. *See United States v. Gallo,* 927 F.2d 815, 821 (5th Cir.1991) ("The government established Gallo's knowledge of the contents of the box recovered from his car by reasonable inferences drawn from his control over the box...."); *United States v. Vera,* 701 F.2d 1349, 1359 (11th Cir.1983) ("Posada's ... control over the boxes while driving the van to the shopping center clearly supports an inference that he knowingly possessed the boxes containing quaaludes.").

Moreover, all of the other evidence discussed above demonstrates that Richard was heavily involved in several aspects of the illegal machine gun transaction. Given this evidence and Richard's dominion and control over the boxes, the jury made a permissible inference that Richard knew the contents of the sealed boxes he delivered.

## B. *Other Crimes Evidence*

■ Richard also argues on appeal that the two weapons seized from his house should not have been admitted into evidence at trial. The weapons were admitted pursuant to Fed.R.Evid. 404(b), the so-called "prior bad acts" provision. Rule 404(b) provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident....

Admission of "prior bad acts" is appropriate under Rule 404(b) and Fed.R.Evid. 403 if "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury's finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989) (citations omitted).

■ We will reverse the decision of the district court to admit evidence under Rule 404(b) only upon a showing of a "clear abuse of discretion." *United States v. Levy,* 955 F.2d 1098, 1102 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992).

Richard contends that admission of these weapons was "intended solely to infer a propensity" on his part to commit unrelated criminal acts. He argues that the weapons found at his house were not similar enough to those contained in the sealed boxes to be probative of his knowledge of the processes used to convert semi-automatic weapons into machine guns and to obliterate their manufacturer's serial numbers. Richard argues that the partial conversion of the .22 caliber rifle found at his home was "amateurish" compared to the professional conversion job done on the M–11s in question. Richard also characterizes the obliteration of the manufacturer's serial numbers on the M–16 found in his house as "amateurish" as opposed to the "highly skilled" obliteration done on the M–11s.

■ We agree with Richard that there are some slight differences in the guns found at his home compared to those contained in the sealed boxes. However, "there is no requirement that the prior acts be virtually identical to the charged acts.... [I]t is sufficient that the acts be similar enough and close enough in time to be relevant." *United States v. McPartlin,* 595 F.2d 1321, 1343 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). The guns admitted into evidence were similar enough to the guns contained in the sealed boxes to be relevant. Both the .22 caliber rifle and the M–11s were originally manufactured to fire semi-automatically, but were either partially or fully converted to fire as machine guns. Additionally, the manufacturer's serial numbers on both the M–16 and the M–11s had been obliterated. Given the high degree of similarity, although not perfect correlation, between the guns seized at Richard's house and those contained in the sealed boxes, we do not believe that the district court committed a "clear abuse of discretion" in admitting the guns into evidence. We agree with the

district court that the guns found at Richard's house are probative of Richard's knowledge of the processes used to convert semi-automatic weapons into fully automatic machine guns and also show that he knew how to obliterate their manufacturer's serial numbers.

■ Moreover, the government was entitled to introduce the challenged weapons to rebut Richard's claim that lacked the requisite knowledge of the contents of the sealed boxes. *United States v. York*, 933 F.2d 1343, 1350 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991) ("When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument. 'Evidence of another crime which tends to undermine the defendant's innocent explanations for his act will be admitted.' ") (citations omitted).

Richard argues, however, that even if the guns were "minimally probative of a material issue other than character," their value was substantially outweighed by the danger of unfair prejudice. Under Fed.R.Evid. 403 relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Because "[a]ssessing the relative impact of the legitimate and illegitimate inferences supported by evidence ... requires a contemporaneous assessment of the presentation, credibility, and impact of the challenged evidence, [w]e ... accord great deference to the district judge's decision to admit or exclude evidence under Rule 403." *York*, 933 F.2d at 1352.

We agree with the district court that the probative value of admitting the guns into evidence is not substantially outweighed by the danger of unfair prejudice. As we have stated, the guns were highly probative in showing that Richard knew how to convert semi-automatic weapons into machine guns and how to obliterate their manufacturer's serial numbers. There was little risk of unfair prejudice because the jury was permitted

to infer that Richard was more likely to have altered the guns and obliterated their serial numbers in the present case, because his past conduct shows that he had the knowledge and ability to do so. Moreover, the district court gave the proper limiting instruction to the jury, stating that the evidence was to be considered only as it tended to show Richard's "motive, knowledge, opportunity, intent, or plan, and not for the purpose of showing that [he] would have the propensity or disposition to commit the crime charged in the indictment." Accordingly, we cannot say that the district court abused its discretion in admitting into evidence the guns found at Richard's house.

### C. *Severance*

Richard also argues that the district court erred by denying his motion for severance under Fed.R.Crim.Pro. 14. He contends that he was entitled to a severance because the "remarkable disparity" between the evidence against him and the evidence against Timothy, made it impossible for the jury to consider independently the evidence against him. Rule 14 gives the district court discretion to, *inter alia,* grant a motion for severance where it appears that the defendant will be prejudiced by a joint trial.

As we have previously explained:

> A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. Actual prejudice means that the defendant could not have a fair trial without severance, "not merely that a separate trial would offer him a better chance of acquittal."

*United States v. Doerr*, 886 F.2d 944, 971–972 (7th Cir.1989) (citations omitted).

Richard has failed to meet his substantial burden under this standard. While it is true that we have recognized that "[d]enial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and his codefendants," *United States v. Moya–Gomez,* 860 F.2d 706, 765 (7th Cir.1988), the mere existence of such a disparity is "is not itself grounds for a severance." *Doerr,* 886 F.2d at 972 (citations omitted). Rather, "the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against him." *Moya–Gomez,* 860 F.2d at 765 (citations omitted).

In this case, the district court gave the following limiting instruction to the jury:

[a]lthough the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him.

"Because we must presume that jurors are capable of following the court's limiting instructions and sorting through the evidence for each defendant separately," *Doerr,* 886 F.2d at 972, Richard's mere speculation that the jury was unable to do so, "does not constitute the demonstration of actual prejudice required to challenge successfully a district court's denial of a severance motion." *Id.* Accordingly, we hold that the district could did not abuse its discretion in refusing to grant the motion for severance.

### III. *Timothy Tylkowski*

Timothy argues that there is insufficient evidence to support Richard's conspiracy conviction, therefore his conviction must also be reversed because the law requires the participation of more than one person to support a conspiracy conviction. Because we find that there was sufficient evidence to support Richard's conspiracy conviction, we affirm Timothy's conviction as well.

### IV. *Conclusion*

For all of the foregoing reasons, the convictions of the defendants are AFFIRMED.