**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Glenn FORD, Robert Gipson and Ladell Jacobs, Defendants–Appellants.**

**Nos. 92–2751, 92–2753 and 92–2879.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1993.

Decided April 13, 1994.

James A. Shapiro, Asst. U.S. Atty., Crim. Div. (argued), Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL for U.S.

Nathan Diamond–Falk, Chicago, IL (argued), for Glenn Ford.

John M. Kalnins, Chicago, IL (argued), for Robert Gipson.

John A. Meyer, Chicago, IL (argued), for Ladell Jacobs.

Before GIBSON,* KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Glenn Ford, Ladell Jacobs and Robert Gipson were employed as "correctional residence counselors" at the Metro Community Correctional Center, a Chicago work release facility operated by the Illinois Department of Corrections. A jury heard evidence that the three had accepted bribes from residents in the form of cash, cocaine and automobile repair jobs in exchange for various favors. These included assigning preferable rooms, altering records to cover for residents who were not at work or the center at designated times, and altering urine samples known to be positive for drugs or alcohol. The jury convicted all three defendants of conspiring to violate and of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"). It also convicted Ford of distributing cocaine. The court sentenced each defendant under the Guidelines to forty-two months of incarceration. The defendants challenge their convictions on the ground that they are not supported by sufficient evidence, and Gipson also disputes several of the district court's evidentiary rulings. All three defendants also appeal their sentences, contesting the enhancement of their offense levels pursuant to Guidelines section 3B1.3. They thereby raise an interesting Guidelines question of first impression in this circuit. Because all of the defendants' arguments ultimately lack merit, however, both their convictions and their sentences are affirmed.

I. Sufficiency of the Evidence

All of the defendants argue that the evidence was insufficient to support their conspiracy convictions.[1] The defendants bear a heavy burden in attempting to overturn their convictions on the basis of insufficient evidence. In reviewing the evidence, we must draw all reasonable inferences in the government's favor, and we will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt. *United States v. Scarbrough*, 990 F.2d 296, 299 (7th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 121, 126 L.Ed.2d 85 (1993); *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir.1992). We will not reweigh the evidence or reevaluate the credibility of the witnesses. *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir.1992).

In order to prove the existence of a conspiracy, the government must establish that "1) the defendants agreed to accomplish an illegal objective; 2) the defendants performed at least one overt act in furtherance of the illegal objective; and 3) the conspirators intended to commit the substantive offense." *Scarbrough*, 990 F.2d at 299. Here, the defendants challenge the district court's finding regarding the first of those elements, arguing that the evidence did not show an agreement among the three or that they acted in concert to achieve a common purpose. Instead, the defendants contend, the

---

\* The Honorable Floyd R. Gibson of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Gipson seems at points to frame his argument in terms of variance (e.g. "the proof was at variance with the charge" (Gipson Brief at 10)), but that concept, which deals with whether the conspiracy proved differs from the conspiracy charged, has no applicability here. Gipson does not assert that a different conspiracy has been established, he argues that no conspiracy has been established.

evidence revealed that each defendant acted individually in pursuit of his own self-interest, which often conflicted with that of his codefendants.

■ But the evidence presented at trial was clearly sufficient to support the inference that the defendants acted in concert, pursuant to a mutual agreement. Because conspiracies are secretive by their very nature, the government is not required to present evidence of a formal agreement. *Id.* Instead, "an agreement to conspire may be established by circumstantial evidence, including reasonable inferences drawn from the defendants' conduct and overt acts." *Id.* The evidence linking the defendant to the conspiracy must be substantial. *United States v. Durrive,* 902 F.2d 1221, 1228 (7th Cir.1990).

■ The government's case against the defendants was based mainly on evidence gathered from two Metro Center residents who were also government informants, Henry Olave and Terry Newsome.[2] With the cooperation of Olave and Newsome, the government was able to tape record numerous conversations that incriminated the defendants. Among those were several that supported the inference that the three were acting together, pursuant to a conspiratorial agreement. For example, during a January 6, 1989 conversation that included Jacobs, Ford, Olave and Sabina Carlson (an undercover Chicago Police Task Force Agent posing as Olave's sister-in-law) Jacobs and Ford argued over who should receive a $200 payment. Jacobs stated, "... what's the matter, we're working together, ain't we?" (Govt.Ex. 14 at 10.) During a November 8, 1988 conversation with Olave and Carlson, Gibson said, "... this ain't nobody's business but me, you and Ford." (Govt. Ex. 10 at 8.) And, in a December 15, 1988 conversation, Jacobs told Olave regarding falsifying the records of Olave's whereabouts:

Yeah, you just have to know how to do it. See, Gipson's alright, but he, I tell him how

to do things, sometime he don't listen, you know ...

(Govt.Ex. 13 at 3.)

Finally, on January 10, 1989, Jacobs, Olave and Carlson had the following conversation:

Henry Olave: ... any way I can be out of Metro for like one or two nights.

\* \* \* \* \* \*

Ladell JACOBS: ... I don't have the authority ...

\* \* \* \* \* \*

TFA Carlson: How about um, Glenn [Ford]? ...

\* \* \* \* \* \*

Ladell JACOBS: ... he wouldn't be able to do that I don't think, because see, the other staff people ... then you gotta explain why, I mean ... what's up, what do you gotta do?

\* \* \* \* \* \*

Ladell JACOBS: Yeah, I'll talk to Ford about it.

\* \* \* \* \* \*

Ladell JACOBS: ... Let me talk to Ford and see what we can do.

\* \* \* \* \* \*

Henry Olave: ... What's up with Gipson today, man? He didn't talk to us or nothing. What's up with Gipson, man?

Ladell JACOBS: ... Gipson's just a little odd ... he ain't about nothing ... I told him to stop bugging you guys, man.

\* \* \* \* \* \*

Ladell JACOBS: I told him, I said man, I don't bug the guys, don't bug the guys, let them go at their own pace, you know, they nice, man. Don't, don't harass these ...

Henry Olave: ... What did he say?

Ladell JACOBS: It's cool man, it's cool ...

(Govt.Ex. 16 at 2–6.)

These conversations reveal conspiratorial ties between all three of the defendants, sup-

---

**2.** Olave was already cooperating with the government on another matter when he entered the

Metro Center in January 1988. Newsome became a government informant in August 1989.

porting the inference that they were acting in unison, pursuant to a mutual agreement. The same inference is supported as to Ford and Jacobs by the fact that they twice came together to meetings with Olave or Newsome at which the scheme was discussed and pay-offs traded hands. In addition, the government presented evidence showing that the participation of all three defendants was necessary for the scheme to function. In order to cover for Olave and Newsome around the clock, for example, the three needed to coordinate their efforts over the course of their various shifts.

■ The defendants argue that the inference of an agreement is rebutted by several conversations, such as the one discussed above, in which the defendants argued among themselves as to who should receive various payments.[3] But haggling among coconspirators does not necessarily negate the inference that they were working together. The fact that each defendant had an individual interest that motivated him to participate in the conspiracy and that at times put him at odds with his coconspirators is not inconsistent with the inference that the three were acting in unison to achieve their shared overall goal. The evidence of an agreement between the three defendants was sufficient to support the jury's verdict.

## II. Evidentiary Rulings

### A. Admission of Coconspirator Statement

■ After his release from the Metro Center, Newsome met with Jacobs on January 8, 1990 to discuss Newsome's friend Paul, who was soon to arrive at the center and wanted to participate in the bribery scheme. During that conversation, which was tape recorded and admitted into evidence, Newsome asked that Gipson, whom he had found to be a nuisance, stay away from Paul. Newsome stated, "I ain't gonna have nothing to do with him. He ain't, he ain't gonna be nothing for Paul, you know what I mean?" And Jacobs responded, "I hear ya, I hear ya." (Govt.Ex. 17 at 3.) After Newsome further explained

how Gipson had pestered him and Olave, Jacobs stated, "Yeah, I hear ya ... I know, many guys told me the same thing, some other guys." (Govt.Ex. 17 at 3.) Gipson argues that that statement should not have been admitted into evidence because it consists of double hearsay, but his argument is without merit.

■ The first asserted level of hearsay is taken care of by Fed.R.Ev. 801(d), which provides that a statement is not hearsay if:

(2) The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

A district court may rely on this exception if it finds by a preponderance of the evidence that "(1) the declarant and the defendant were members of a conspiracy; (2) the conspiracy existed at the time the statement was made; and (3) the statement was made in furtherance of the conspiracy." *United States v. Neely*, 980 F.2d 1074, 1089 (7th Cir.1992); *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir.1992); *see also United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). We review the district court's finding that the requirements of Rule 801(d)(2)(E) were fulfilled for clear error. *Rodriguez*, 975 F.2d at 409.

Here, Gipson contests the district court's finding that the statement was made in furtherance of the conspiracy (*See* March 24, 1992 Tr. at 300), arguing that the conversation as a whole evinced an intention to exclude Gipson from the scheme. But the district court's finding that the statement was made in furtherance of the conspiracy was not clearly erroneous. Jacobs' objective in making the statement was to perpetuate the conspiracy by enlisting the participation of a new resident, and his sympathetic statements regarding Gipson were geared toward that end. Jacobs did not state that Gipson would not continue to participate in the scheme, but merely acknowledged Newsome's complaints. Nor has Gipson at any point argued that his

---

3. Gipson also points to Olave's testimony at trial that when checking Olave in one night, "[Gipson] said that he knew that I was giving money to Mr. Jacobs and Ford, but that he was the one that was taking care of me, that he was really the one who was looking out for me." (Mar. 25 Tr. at 366.)

participation in the conspiracy did not span its full lifetime. The district court therefore did not err in finding that the statement did not reflect Gipson's exclusion from the scheme but was meant instead to perpetuate the conspiracy.

The second layer of hearsay that Gipson finds in the statement is its reference to the statements of "many guys." But, as the government has correctly pointed out, Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The "many guys" statement was not offered to prove the truth of the matter asserted, but only to show Jacobs' attempt to bring a new resident into the scheme. Whether or not many guys had actually spoken to Jacobs about Gipson was completely irrelevant to the government's case. The "many guys" statement therefore was not hearsay.[4]

## B. Impeachment of Olave

During his cross-examination of Olave, Gipson's counsel asked Olave whether he had ever been known by another name and Olave stated that he had not. Gipson's counsel then sought to show that Olave had testified untruthfully by asking Carlson during her cross-examination whether Olave had ever been known by another name. The government objected on the ground that Olave was in the witness protection program and needed to prevent his new identity from being revealed. The district court found that the testimony would have been "[c]ollateral,

at best" and sustained the government's objection. (Mar. 27, 1992 Tr. at 740.) We review the district court's rulings on cross-examination for an abuse of discretion. *Neely*, 980 F.2d at 1080; *United States v. Torres*, 965 F.2d 303, 310 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 237, 121 L.Ed.2d 172 (1992).

Here, the district court did not abuse its discretion. The evidence was indeed collateral, as its only purpose would have been to catch Olave in a lie. And it is well-settled that "a witness may not be impeached by contradiction as to collateral or irrelevant matters elicited on cross-examination." *Taylor v. National R.R. Passenger Corp.*, 920 F.2d 1372, 1375 (7th · Cir.1990) (quoting *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 604 (7th Cir.1985)); *see also United States v. Goot*, 894 F.2d 231, 239 (7th Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 45, 112 L.Ed.2d 22 (1990).

## III. Sentencing

The defendants were sentenced under Guidelines section 2E1.1, which applies to RICO offenses and establishes as a base offense level the greater of "(1) 19; or (2) the offense level applicable to the underlying racketeering activity."[5] Because the underlying racketeering activity here was bribery, subsection (2) required reference to the public bribery guideline, section 2C1.1.[6] That guideline in turn provided for a base offense level of 10, which would have been increased by two levels because the offense involved more than one bribe (U.S.S.G. § 2C1.1(b)(1)), to produce a total offense level of 12.[7] Be-

---

4. Gipson also argues for the first time on appeal that the "many guys" statement was character evidence excludable under Fed.R.Ev. 404(a). Because Gipson did not raise that argument below (*see* March 24 Tr. at 297–301), we need not address it, as the district court's admission of the evidence clearly was not plain error.

5. The conspiracy and substantive RICO counts had been grouped pursuant to section 3D1.2(b) because they "involve[d] the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). Ford's cocaine distribution counts were also grouped with the RICO and conspiracy counts pursuant to section 3D1.2(c) because they

involved conduct that was part of the activity charged in those counts.

6. Section 2C1.1 falls within Chapter 2, Part C, which includes "offenses involving public officials." The guideline itself is entitled "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right." As shorthand, we will refer to section 2C1.1 as the "public bribery" guideline. That designation makes clear its distinction from section 2B4.1, which pertains to commercial bribery.

7. Gipson's Presentence Investigation Report ("PSR") indicated that he would have received an additional one-level increase pursuant to section 2C1.1(b)(2)(A), presumably to reflect that the

cause 12 is less than 19, the defendants received a base offense level of 19 under subpart (1) of the RICO guideline. That offense level was then increased by two pursuant to Guidelines section 3B1.3, because the crime involved the abuse of a position of public trust. The adjusted offense level for each defendant was therefore 21. On appeal, defendants argue that the section 3B1.3 enhancement for abuse of trust was inappropriate. Because the proper application of the guideline is a question of law, it is subject to de novo review. *United States v. Gaines*, 7 F.3d 101, 103 (7th Cir.1993); *United States v. Hayes*, 5 F.3d 292, 294 (7th Cir.1993).

 Section 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

In other words, the enhancement should not be applied when the offense itself entails an abuse of trust. Public bribery is clearly one such offense, as the commentary to the public bribery guideline expressly precludes the enhancement for offense levels calculated thereunder. *See* U.S.S.G. § 2C1.1, comment. (n. 3). The defendants argue that they should likewise be exempt from the enhancement because their RICO offenses rest solely on predicate acts of public bribery. Put another way, because the enhancement would not have applied if they had been sentenced under subpart (b) of the RICO guideline (and so via cross-referencing under the public bribery guideline), they argue that it also should not apply to their offense levels derived through subpart (a). Although it has

some intuitive appeal, their argument ultimately fails.

One of the Guidelines' primary purposes is uniformity in sentencing—individuals who commit similar offenses are to be sentenced similarly.[8] Toward that end, the Guidelines establish a base offense level for each of a long list of offenses, and every defendant who commits the same offense receives the same base offense level. At the same time, because not all offenses that fall under the same guideline are similar in all ways relevant to sentencing, the Guidelines provide various avenues for distinguishing between offenses that are within the same category.[9] In addition to the distinctions that are accounted for within each guideline itself, the Chapter Three offense level adjustments serve as another means of effectuating this countervailing concern. Under Guidelines section 3A1.1, for example, the offense level will always be increased by two if the offense was committed against a "vulnerable victim," regardless of the nature of the underlying offense.

In line with this reasoning, the First Circuit noted in its discussion of the same issue we now confront that "[t]he base offense level prescribed by the guidelines for a particular crime presumably reflects, or 'includes,' those characteristics considered by Congress to inhere in the crime at issue." *United States v. Butt*, 955 F.2d 77, 89 (1st Cir.1992). Because abuse of public trust is an inherent element of public bribery, then, it is already reflected in the base offense level established for that crime and the enhancement would be inappropriate. In other words, because every act of public bribery inherently entails an abuse of public trust, no enhancement is necessary to distinguish among various public bribery offenders. That reasoning presumably underlies the ap-

value of the bribes was between $2001 and $5000 (*see* U.S.S.G. §§ 2C1.1(b)(2)(A); 2F1.1(b)(1)(B)). His total offense level under the bribery guideline would therefore have been 13. The PSRs of Ford and Jacobs did not indicate that they would have qualified for the increase, which does not apply if the amount of the bribes was less than $2000. Although the source of these differing amount calculations is unclear, and may reflect an error either as to Gipson or as to Ford and Jacobs, the question is ultimately irrelevant, as the bribery guideline in all events

would have produced an offense level less than 19 and so been inapplicable.

8. *See* U.S.S.G., Introduction at 2 ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.").

9. *See* U.S.S.G., Introduction at 2–5.

plication note that precludes the enhancement for offenses sentenced under the public bribery guideline. *See* U.S.S.G. § 2C1.1, comment. (n. 3).

The crime of racketeering, by contrast, does not in all cases entail an abuse of trust, so that the minimum base offense level of 19 established for *all* RICO offenses does not already incorporate that element. Instead, the Sentencing Commission has determined that all RICO offenses merit a minimum offense level of 19, and those RICO offenses that entail an abuse of trust must, under the logic of the Guidelines, be distinguished on the basis of that additional element by receiving the two-level enhancement.[10] Thus, contrary to the defendants' argument that their offense level ought not to be enhanced because their particular RICO offenses rest solely on predicate acts of public bribery (of which the abuse of trust is an inherent element), that fact is precisely the reason that the enhancement is appropriate in their case. Their particular RICO offenses are distinguishable from RICO offenses in general because they entail an abuse of public trust, and the enhancement is necessary to reflect that distinction. The fact that the defen-

dants would not have received the enhancement if they had been sentenced under the public bribery guideline is irrelevant because, unlike the RICO guideline, that guideline does incorporate the abuse of trust into its base offense level.

The public bribery guideline itself reflects this very reasoning. Application Note 3 to section 2C1.1, the note that exempts public bribery offenses from the abuse of trust enhancement, provides in full:

> Do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill) except where the offense level is determined under § 2C1.1(c)(1), (2), or (3). In such cases, an adjustment from § 3B1.3 (Abuse of Position of Trust or Use of Special Skill) may apply.

*See also* U.S.S.G. § 2C1.1, comment. (backg'd). The excepted subsections 2C1.1(c)(1), (2) and (3) enumerate circumstances under which defendants are to be sentenced under another guideline pursuant to cross-referencing, despite having committed the offense of public bribery.[11] Thus, Application Note 3 makes clear that the abuse of trust exemption does not carry over in cross-referencing situations. Once a dif-

---

**10.** In *Butt,* the First Circuit expounded on this point:

> Because the RICO statute, by contrast, can be violated in innumerable ways, there are, arguably, no offense characteristics common to all RICO offenses. We believe it appropriate, therefore, to take the base offense level set forth in § 2E1.1(a)(1) as one finds it—as establishing a *generic* base offense level for RICO crimes, one that "includes" no particular offense characteristic or special skill.
>
> \* \* \* \* \* \*
>
> Subsection (a)(1), as we understand it, establishes a minimum base offense level (nineteen) for RICO violations. This minimum reflects a legislative judgment that RICO violations—because entailing not one criminal act, but a pattern of predicate crimes—warrant a higher base offense level than do nonracketeering offenses. The comparison between subsections (a)(1) and (a)(2) mandated by § 2E1.1 merely ensures that a RICO defendant will not receive a *lesser* sentence than would attach to the underlying acts, simply by virtue of his having committed them in furtherance of a racketeering scheme.
>
> Properly understood as a universal base offense level for RICO violations, implying no specific offense characteristics, subsection (a)(1) cannot be read to "include" abuse of

trust. It, therefore, does not fall within the limitation of § 3B1.3, and applying the abuse of trust adjustment to the subsection (a)(1) calculation produces no double counting.

955 F.2d at 89 (citations omitted). *See also United States v. McDonough,* 959 F.2d 1137, 1141–42 (1st Cir.1992).

**11.** Subsection 2C1.1(c) provides:

> (c) Cross References
>
> (1) If the offense was committed for the purpose of facilitating the commission of another criminal offense, apply the offense guideline applicable to a conspiracy to commit that other offense if the resulting offense level is greater than that determined above.
>
> (2) If the offense was committed for the purpose of concealing, or obstructing justice in respect to, another criminal offense, apply § 2X3.1 (Accessory After the Fact) or § 2J1.2 (Obstruction of Justice), as appropriate, in respect to that other offense if the resulting offense level is greater than that determined above.
>
> (3) If the offense involved a threat of physical injury or property destruction, apply § 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) if the resulting offense level is greater than that determined above.

ferent guideline comes into play, the abuse of trust enhancement should be applied even though the new offense is based on the underlying offense of public bribery, presumably because the abuse of trust is not already reflected in the base offense levels for those other offenses.[12]

## IV. Conclusion

The defendants' convictions were supported by sufficient evidence, the challenged evidentiary rulings were not erroneous, and the enhancement for abuse of trust was appropriate. The defendants' convictions and sentences are therefore AFFIRMED.

---

12. The fact that cross-referencing to the RICO guideline is not among the situations enumerated in the public bribery guideline is not significant. First, an explicit reference to RICO in the bribery guideline would have been superfluous, because the RICO guideline itself insures that the desired cross-referencing will occur. And, regardless of the fact that RICO is not mentioned, the reasoning behind the exclusion of these cross-referencing situations clearly carries over into that context.